WASHINGTON COURTE CONDOMINIUM ASSOCIATION-FOUR *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. WASHINGTON-GOLF CORPORATION *et al.*, Defendants-Appellants and Cross-Appellees and Third-Party Plaintiffs-Appellants (Rabin Lenoble and Associates *et al.*, Third-Party Defendants-Appellees).

First District (1st Division)   Nos. 1—91—2247, 1—91—3036 cons.

Opinion filed June 30, 1994.—Rehearing denied December 2, 1994.

Rooks, Pitts & Poust, Law Offices of Jeffrey M. Marks, and Richard J. Prendergast, Ltd., all of Chicago (Stephen E. Sward, Jeffrey M. Marks, Richard Capra, Joseph E. Tighe, and James Prendergast, of counsel), for appellants.

Rooks, Pitts & Poust, of Chicago (Stephen E. Sward, of counsel), for third-party appellants Washington-Golf Corporation, Raymond J. Adreani, Bruce Adreani, and Edmund J. Beaulieu.

Pope & John, Ltd., of Chicago (William J. Kunkle, Jr., Scott B. Greene, and Derek J. Meyer, of counsel), for appellees Washington Courte Condominium Association-Four.

Di Monte & Lizak, of Park Ridge (Chester A. Lizak, Alan L. Stefaniak, and Richard W. Laubenstein, of counsel), for appellee Hans Rosenow Roofing Company.

Cassiday, Schade & Gloor, of Chicago (A. Jeffrey Seidman, Timothy J. Ashe, Lynn D. Dowd, and Michael M. Tannen, of counsel), for appellees Rabin LeNoble & Associates, Zorak Rabin, and Daniel LeNoble.

Orner & Wasserman, Ltd., of Chicago (Norton Wasserman and Mary A. Mazurk, of counsel), for appellee A. Christmann & Company, Inc.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

This is a consolidated appeal, arising from a lawsuit brought by plaintiffs, Washington Courte Condominium Association-Four, and others, claiming loss due to property damage to the Washington Courte Condominium building four. On June 20, 1991, following a jury trial, plaintiffs were awarded compensatory damages in the amount of $1,700,000 for breach of express and implied warranties and common law fraud in the sale of condominium units by Washington-Golf Corporation (Washington-Golf), Raymond J. Adreani, Bruce Adreani, and Edmund J. Beaulieu (cumulatively, defendants). On August 20, 1991, the trial court entered an order denying defendants' post-trial motions and denying plaintiffs' motion for attorney fees and costs. In addition, the trial court entered judgment against all defendants on count V of plaintiffs' amended complaint for statutory fraud under the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1991, ch. 121$^1$/2, par. 261 *et seq.* (now 815 ILCS 505/1 *et seq.* (West 1992))) (Consumer Fraud Act).

On August 22, 1991, the trial court entered judgment against defendants *nunc pro tunc* August 20, 1991, in the sum of $1.7 million on count V of plaintiffs' fifth amended complaint, with the limitation that:

"The judgment amount of $1.7 million is not intended to be in addition to the $1.7 million judgment previously entered on the jury verdict in this cause. Plaintiffs shall be entitled only to a single recovery of $1.7 million by reason of the judgment on the jury verdict and the judgment in this order."

Defendants now appeal from the judgment rendered at trial and from the trial court's order denying defendants' post-trial motions. Defendants contend that: (1) the fraud verdict was against the manifest weight of the evidence; (2) the trial court improperly allowed evidence at trial regarding defendants' purported negligence; (3) evidence regarding the sale prices of certain condominium units was improperly excluded; (4) the trial court improperly refused to give a jury instruction defining "clear and convincing evidence"; (5) plaintiffs' jury instruction No. 20 misstated the law and was

improperly given to the jury; (6) the jury failed to consider plaintiffs' failure to mitigate damages; (7) the jury's damage award was excessive; and (8) the trial court erred in finding a violation of the Consumer Fraud Act. Defendants did not seek to stay enforcement of the judgment against Washington-Golf by posting an appeal bond on that entity's behalf, nor does the record indicate that any appeal bond was posted on behalf of Edmund Beaulieu.

Plaintiffs cross-appeal, arguing that the trial court erred in denying their claim for attorney fees. While the appeal was pending, plaintiffs filed a motion with this court to strike certain portions of defendants' reply brief. The motion was taken with this appeal.

Defendants' second appeal is from two orders of the circuit court. The first, entered May 17, 1991, dismissed defendants' third-party complaint against third-party defendants Rabin LeNoble & Associates (Rabin-LeNoble), Zorak Rabin, Daniel LeNoble, Hans Rosenow Roofing Company (Rosenow), and A. Christmann and Company, Inc. (Christmann) (collectively third-party defendants), pursuant to section 2—619 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 2—619), on the ground that it was barred by the then applicable two-year construction statute of limitations (Ill. Rev. Stat. 1983, ch. 110, par. 13—214). The second order, entered June 24, 1991, denied defendants' petition for reconsideration of the trial court's order granting dismissal. For the following reasons, we affirm the judgments of the trial court.

## BACKGROUND

### PLAINTIFFS' COMPLAINT

On June 30, 1983, plaintiffs filed their original complaint against defendants, alleging property damage to building four as a result of water infiltration. In their five-count, fifth amended complaint, filed June 10, 1991, plaintiffs alleged that defendants: breached an express warranty that building four and the individual units would be free from defects in materials and workmanship (count I); breached the implied warranty of habitability (count II); failed to disclose defects in construction (count III); breached their fiduciary duty to disclose, remedy or repair alleged defects in the building (count IV); and violated the Consumer Fraud Act through their omissions and misrepresentations (count V).

Plaintiffs' fifth amended complaint contains the following allegations. In 1975, defendants Raymond Adreani (Ray), Bruce Adre-

ani (Bruce), Edmund Beaulieu (Ed) and Michael Beaulieu (Michael)[1] formed Washington-Golf for the purpose of developing Washington Courte, a condominium complex in Niles, Illinois. In April 1977, defendants engaged Rabin-LeNoble as architects to prepare preliminary and working architectural and structural drawings for use by Washington-Golf in the construction of the Washington Courte development. Defendants then entered into a subcontract with Rosenow under which Rosenow was to furnish and install a roof on each building of the Washington Courte development. Defendants also entered into a subcontract with Christmann under which Christmann was to furnish and install the brick and masonry on buildings two through five. Between approximately February 1978 and May 1980, Washington-Golf, acting as the general contractor, developer, and owner of the tract, constructed the five 44-unit condominium buildings of Washington Courte. Building one was completed in late 1978. Buildings two and five were completed in mid-1979. Buildings three and four were completed in 1980.

In December 1979, prior to the completion of building four, defendants learned that other condominium buildings in the Washington Courte development were experiencing severe water infiltration problems, cracked masonry, and window leaks.

On or about December 15, 1980, defendants began to market and sell units in building four. During 1981 and 1982, individuals began occupying their units in building four and reporting water infiltration problems to defendants. Defendants responded that all water leakage problems were minor and unit-specific, and that these problems had been or would be cured.

On November 30, 1982, the principals of Washington-Golf held a meeting, at which time the control of the board was turned over to each individual condominium association in the Washington Courte development.

In May 1983, plaintiffs engaged the services of a structural engineer who, after his investigation, concluded that building four contained various latent structural defects which resulted in substantial water infiltration into both the common elements and the dwelling units of building four.

In count III of their fifth amended complaint, plaintiffs alleged that defendants, Washington-Golf, Ray, Bruce, Ed and Michael, knowingly failed to disclose the existence of severe water infiltration problems, cracked masonry and window leaks in building four, which

---

[1]Michael Beaulieu was dismissed as a defendant by directed verdict during the trial.

defendants knew to be pervasive and recurrent, provided false assurances to unit owners that all water leakage problems were minor and unit-specific and that these problems had been or would be cured, and that these misrepresentations and omissions were part of a plan or scheme to induce plaintiffs to rely on defendants in purchasing condominium units in building four. Plaintiffs further alleged that they reasonably relied on defendants' misrepresentations and omissions and thereby acted to their detriment in purchasing condominium units. Finally, plaintiffs alleged that they suffered damages in excess of $1,500,000.

## TRIAL

Trial commenced on June 3, 1991. The trial lasted almost three weeks and included the testimony of 40 fact witnesses, five expert witnesses, the stipulated testimony of 14 fact witnesses and admission of over 250 exhibits.

A. Development of Washington Courte

At trial, both Ray and Ed testified that they had experience in constructing and developing single-family homes and multidwelling buildings. Ray testified that he had been in the construction business for 40 years and that he was president of Norwood Builders, a general contractor that built 700 to 900 brick homes starting in the 1950s.

Ed is a licensed real estate broker and a union carpenter. Ed testified that he became a real estate developer in the late 1960s. Between 1970 and 1980, Ed operated his own company, Beaulieu & Sons, through which he developed another condominium complex in Niles and a commercial shopping center. In 1975, Ed obtained an option contract on 13 acres in Niles that eventually became the Washington Courte development. Ed approached Ray about participating in the development of the property and together they formed Washington-Golf.

Washington-Golf Corporation consisted of Ed, president, and Ray, vice-president and treasurer or secretary, and each of them and their respective families holding 50% of the shares of the corporation. Bruce and Michael were also shareholders of Washington-Golf. Ed testified that the title of president did not connote any particular responsibility in the company, but that he was made president because it was his option that brought the property into Washington-Golf. Ed decided that Ray would act as the general manager, in charge of construction, and Bruce was responsible for sales and some marketing. Ed was responsible for the closings of the condominium

units and preparing the closing documents. Ed also participated in the preparation of the condominium declarations and bylaws.

Prior to construction of the development, defendants submitted two required property reports to the Village of Niles. These reports were also required to be distributed to prospective buyers. The reports stated in part:

"The Washington-Golf Corporation, the developer of Washington Courte, agrees with the stated purpose and intent of the Niles Ordinance and feels that full and complete disclosure by the developer is the best way to permit a prospective purchaser to make as complete an investigation of the condominium as he wishes."

The architectural plans (plans) for the entire development required "barrier walls," which incorporated "collar joints." Ray testified that a collar joint is the space between an outer wide course of brick masonry and an inner wide course of brick masonry. The plans required that the collar joints be filled solid with mortar.

Ray stated that the plans required a Cono-Lock exterior wall. Ray explained that Cono-Lock is a mesh wire approximately $11^1/_2$ inches wide, one-eighth inch diameter criss-cross, which is installed above every second course of block, approximately every 16 inches. Ray stated that the purpose of the Cono-Lock reinforcement is to hold together, along with the collar joint, the outer face brick and inner wall of concrete block. He stated that the collar joint bonds the block and brick together if it is filled.

Ed testified that a solid-filled collar joint is supposed to strengthen the wall. Art Christmann, the masonry contractor, stated that from his experience, it is only possible to fill the collar joints 85% full, but that he never raised the issue with the architect. Ed stated that all five buildings in the Washington Courte development are designed and built the same way.

Ray and Ed testified that they each visited the project regularly to ensure that the condominium buildings were being constructed in accordance with the architectural plans. Based on Ray's signed agreement with the architects on behalf of Washington-Golf, the architects had no responsibility for on-site supervision of the construction of the development. Ray explained:

"I had maybe more experience than [the architect] did as far as buildings that are going up. I built buildings and he just drew buildings, I understood buildings much more. I started out as a carpenter myself."

Ray stated that he visited the construction site two to three times a week for about an hour during construction. Ray stated that he did

*not closely inspect the walls as they were being constructed to see if the collar joint was solid filled.*

### B. Water Infiltration Problems in Washington Courte

Plaintiffs' evidence at trial revealed that defendants were made aware of water problems at the Washington Courte development in December 1979 following a heavy rainstorm. While inspecting building one, construction supervisor Raymond Spear (Spear) observed water entering above the windows and identified the mortar joints, the roof, and the windows as possible sources of water infiltration.

Spear testified that after he inspected building one, he recommended to Ray, contrary to the requirements of the architectural plans, that the collar joint not be filled solid with mortar in the remaining buildings because he considered it to be a "conductor of water." However, Spear cautioned Ray that an unfilled collar joint could adversely affect the strength of the buildings.

On February 1, 1980, Herb Weinberg, the president of Washington Courte Condominium Association-Two (Association-Two), sent a letter to Ray complaining about "severe water leakage" in units that had occurred after a rainstorm on December 24, 1979. The letter indicated that Spear visited several units in building two with a caulker and informed unit owners that the water problem was not due to caulking.

A series of letters to defendants from the associations at buildings one, two and five followed through 1980, complaining of further water damage, cracking masonry and of defendants' failure to make the required repairs despite constant notification. On July 28, 1980, the presidents of buildings one, two and five sent a letter to defendants demanding a meeting to discuss major problems in all of the buildings including:

> "1. Water seepage through walls, over and around windows, patio doors and lentils [*sic*].
> 2. Water backup from down spouts resulting in apartment and common area flooding.
> 3. Standing water on roofs resulting in leakage."

On August 13, 1980, the president of Washington Courte Association-Five (Association-Five) threatened to take "appropriate action" if defendants did not respond to the July 28, 1980, letter within 10 days. On September 10, 1980, Washington Courte Associations One, Two and Five sent a letter to defendants calling to defendants' attention the following additional problems: (1) water leakage through electrical outlets; (2) backup water from downspouts

and through air conditioning condensation lines; and (3) leakage in unit ceilings on all floors. Ed testified that it was this letter threatening legal action that "possibly" prompted defendants to retain Bruce Ciborowski to perform repairs on the buildings.

Ray admitted that he first learned of water infiltration problems in building one in December 1979; that he learned of water problems in building two in February 1980; and that he knew at least as of July 1980 that building five had water infiltration problems. Ed testified that he knew in 1980 that buildings one, two and five had water infiltration problems. Ed stated that he would not have moved his parents into building five if he believed that the water infiltration problems *he knew about* could not be repaired.

Art Christmann testified that he completed the masonry work on building four in late spring of 1980. Christmann stated that he first learned about the water infiltration problems in Washington Courte during that year. Ray and Ed informed Christmann that building four in particular suffered from water leakage. In the spring or early summer of 1980, Christmann examined the buildings. Christmann stated that he observed problems in every building and believed that building four had the worst water problems.

Between September and December 1980, Ciborowski performed repairs for an aggregate cost of $30,000 on every building in Washington Courte. Ciborowski's treatment involved the application of a water repellant spray on the exterior masonry walls, caulking around windows, and minor roof repairs. Ciborowski provided a one-year guaranty on his repair work. Ray stated that even though building four was not yet occupied, they wanted to caulk and water-proof building four because "we weren't going to take any chances, that's for sure." Ray stated that the retuckpointing and waterproofing would "alleviate the problem" they were experiencing in the other buildings.

On September 10, 1980, buildings one, two and five sent defendants a letter expanding the list of problems specified in their July 28, 1980, letter to include water leakage through electrical outlets and ceilings on all floors.

C. Involvement of the Village of Niles

Additionally, the associations of buildings one, two and five sought the assistance of Nicholas Blase, the mayor of the Village of Niles. Subsequent to the heavy rainstorm of December 24, 1979, Association-One reported the problem to the Village of Niles, and Niles building director Todd Bavaro inspected one of the apartments in building one. In a letter to defendants dated June 17, 1980, Association-One stated:

"Mr. Todd Bavaro, Niles Building Director and our Mr. Till, President of this Association, inspected one of the apartments affected and found a number of bricks cracked on the North wall of this building. Mr. Bavaro concluded that this was due to a construction fault, and that to avoid a similar occurrence, the North side of this building should be caulked and *siliconized*." (Emphasis in original.)

In response to Association-One's June 17, 1980, letter, Bavaro directed a letter to Association-One, dated June 19, 1980, wherein he stated:

"I would like to inform you regarding the one sentence in your letter stating, 'Mr. Bavaro concluded that this was due to a construction fault.' This sentence is erroneous, what was stated when I met with Gene Till was 'that due to settlement, the brick can in fact crack, allowing heavy rains to seep into the building and therefore, cause the apartments to have some water damage.'

Upon our inspection we have found that the entire building meets with the approval of this department, Building Commissioner and the Village of Niles and that the building is structurally sound and conforms to the blue prints as well as the Village codes."

Bavaro did not testify at trial.

On September 13, 1980, defendants and representatives of buildings one, two and five met with representatives of the Village of Niles to discuss possible remedial measures for the continual leakage. The meeting culminated in a "Memo of Understanding," which stated in pertinent part:

"(1) The builders will, by no later than November [1980], correct the situation which allows water to enter into the apartments, whether that be water through the brick itself, or water that comes through the downspouts, or air conditioning system, ceiling, electrical outlets, or through the window seams.

(2) A meeting will be set up with the architect, the weather shield company, the builders, and our Building Department, to discuss these problems so they can be corrected prior to the construction of the new buildings. Mr. Salerno [Niles director of building and zoning] should set up this meeting.

* * *

(6) The roof should be checked as to why it is leaking into the floor below and this should be done within the next thirty days."

On or about October 11, 1980, Ray, Ed and representatives of the Village of Niles were informed by letter from the boards of directors for buildings one, two and five that although repairs had been started, all three buildings continued to experience water leakage problems.

Ray admitted that Ciborowski's work did not prevent water infiltration during the one-year guaranty period.

D. Marketing of Building Four

Defendants began marketing units in building four in late 1980. The Washington Courte disclosure binder for building four indicated that the units were priced ranging from $68,900 to $110,500. Ed and Bruce specifically handled Washington-Golf's marketing efforts. Ed stated that he participated in the closings on units sold in building four. He did not participate in the hiring of salespeople for Washington Courte units and to his knowledge there was no sales training program.

Ray testified that defendants "never told anybody to not say that the buildings leaked or anything like that," but also stated that he did not personally ever tell any of the sales staff about any water leaks in any of the buildings while they were selling units in building four. Ray stated that he did not instruct the salespeople to inform prospective buyers about the work that had been done on building four or any of the other buildings.

Bruce testified that he hired all of the salespeople for Washington Courte. Bruce stated that if people he spoke to asked about water infiltration problems in building one, he mentioned that there were a few isolated cases, but he did not recall if anyone specifically asked about water problems. Bruce admitted that he knew that there were complaints about water infiltration in buildings two and five prior to the closings on the units in building four. Bruce stated that he talked with the salespeople about explaining the water infiltration situation to prospective buyers, but admitted that prospective buyers were not told about the problems unless they asked.

Two unit owners, Dr. and Mrs. Strauss, testified that in 1981 they observed, prior to closing on their unit, water on the sill of an open window in building three. When they called the water to Bruce's attention, Bruce stated: "Well, the window's open. Some idiot must have left the windows open overnight and it rained last night. So that's why it was wet."

Bob Winkle, a salesperson for Washington-Golf, testified on defendants' behalf that he sold units in Washington Courte during 1981 and 1982. Winkle sold approximately 20 to 30 units in building four. On cross-examination, Winkle stated that he was aware that there had been complaints about water problems in some of the other buildings in the complex, but he did not tell prospective buyers in building four about the water problems because he thought they were being taken care of and because they related to other buildings.

Winkle stated that he was not aware of any major complaints from unit owners in building four while he was selling units. On redirect examination, Winkle stated that he checked a unit in building four after a heavy rainstorm "and there was no water that I could see in the unit, and it was not finished."

Sabatino Pavoni, a plaintiff-unit owner in building four and self-employed insurance salesman, testified that he agreed to sell units for Washington-Golf in February 1983. At that time, eight or nine units remained to be sold in building four. Pavoni testified that he knew that three of the units he was supposed to sell were leaking. However, during the time he was selling units, Pavoni believed that the problems in building four were "window problems that need[ed] caulking," because defendants had told him that the leaking problems were isolated window problems that would be corrected. Pavoni sold four units in building four between February and May 1983.

On May 17, 1983, after Pavoni learned of building four's structural problems from John Frauenhoffer, the structural engineer hired by building four, Pavoni orally resigned his position as a salesperson for Washington-Golf. Pavoni submitted a written letter of resignation to defendants dated June 5, 1983. Pavoni cited incompatibility with Bruce as one reason for his resignation.

The evidence indicated that defendants purchased units in building four for their own purposes. Ray testified that he purchased a unit in building four for investment purposes. Bruce testified that he purchased a unit in building four in 1982 to live in with his wife and children. Bruce stated that at the time he moved his family into unit 511, he did not believe there were any structural problems with building four. Bruce believed that the existing water problems were isolated cases because the unit next door to his leaked, but his did not. David Jacobson, Ray's accountant, testified that he purchased a unit in building four in May 1984 at a discounted price. In addition, Ed testified that he bought three units in building five in 1979 for various family members.

E. Testimony of Unit-Owner Plaintiffs Regarding Water Damage in Building Four

Twenty-two plaintiffs-unit owners testified on their own behalf. In addition, the parties stipulated to the testimony of four other residents of Washington Courte. Testimony disclosed that between August 1981 and March 1982, 15 plaintiff purchase transactions closed in building four, the prices of units ranging from $70,900 to $107,500. All unit owners, with one exception, testified that prior to

purchasing their units in building four, they were never told by defendants or any other salespeople about water problems in building four or any other building in Washington Courte. All unit owners testified that had they known about water problems in building four, they would not have purchased their units.

Walburga and Ernst Wagner visited building four in late 1980 and met with Bruce and Winkle. The Wagners returned to visit building four three or four more times in four consecutive weeks. At no time did Bruce tell the Wagners about water infiltration problems in the development. The Wagners closed on unit 510 on August 1, 1981, paying $97,900, and moved into the unit on August 15, 1981. Mrs. Wagner stated that water leaked into their unit the first time it rained. The water came into the kitchen and living room, underneath the sliding doors, soaking the carpet. Mrs. Wagner called Bruce to report the problem and spoke to Bruce's secretary, Terry Rutkowski. Rutkowski told Mrs. Wagner that the problem would be taken care of, but no one came out to the Wagners' that day. Subsequently, the Wagners experienced water problems every time it rained and reported the problems to Bruce. Bruce told Mrs. Wagner not to worry, that they "would take care of it." The Wagners sent letters of complaint to defendants during the one-year contractual express warranty period, on June 15, 1982, and August 9, 1982. Bruce gave Mr. Wagner a caulking gun and told him to caulk the windowsill. The leaking persisted despite Mr. Wagner's effort to caulk his own windows. Mrs. Wagner stated that they continue to experience water problems every time it rains.

Geraldine Jarol testified that she was shown unit 308 in building four by Fay Levin, a Washington-Golf salesperson. Ms. Levin did not tell Jarol anything about any water problems in any of the other buildings in the complex, or about any repair measures the defendants had taken on any of the buildings.

Jarol purchased unit 308 for $89,000. Jarol stated that prior to moving into her unit in August 1981, she had a conversation with a friend, Miriam Hessler, who lived in building five. Hessler told Jarol that she had water problems in her unit in building five, but that after the building was siliconized, she had no further problems. Jarol then went to the builders' office and spoke to Bruce about the water problems in building five, and Bruce responded that the problems had been "taken care of."

Jarol moved into her unit in building four on August 28, 1981. Within six weeks of her move, she experienced severe water leakage in her master bedroom, on the east wall of her unit, during a heavy rainstorm. Jarol described the water as "coming down almost in a

sheet." At a later date, Jarol had water coming into the second bedroom, which faces north. On October 28, 1986, she experienced water problems in the living room through the ceiling.

Jarol called Bruce several times, and initially spoke to Rutkowski. Each time, Rutkowski told Jarol that her water problems would be taken care of.. At various times, Jarol stopped Bruce in the building and complained to him. However, at the time of trial, Jarol was still experiencing water leakage in her unit whenever there was a strong rain combined with a strong wind.

Mark Miller bought unit 408 in building four for $89,000 in September 1981. Miller stated that when he was shown his unit by Winkle, he did not see any water problems, and no one at Washington-Golf told him about any water problems. He did not ask if there were any problems because it was a brand new building and he didn't think it would have any problems: "When you buy something that's brand new, you don't think you're going to have problems right away," Miller stated.

Miller first discovered water leakage in February 1983, coming from the ceiling, the closet and the baseboard in the master bedroom. Miller stated that because of the dampness, he has had two crops of mushrooms growing on the carpeting in his unit since 1983. Two of the mushrooms removed from Mr. Miller's unit were shown to the jury.

On cross-examination, Miller stated that he was aware that tuck-pointing work was done on other buildings but not on building four.

Thomas Sidney purchased unit 201 for $92,500 and moved in in October 1981. Sidney testified that shortly after he moved into his unit, he observed water leaking through cracks in the balcony above this unit. Sidney reported this leakage to defendants, but nothing was ever done to rectify the problem.

Martin Gerhardt purchased unit 411 in building four for $107,500 and moved into his unit in August 1982. Gerhardt testified that Washington-Golf salesman Bob Winkle told him that "these were deluxe units, a quality building, the units were of excellent quality, etc." Neither Winkle nor anyone else told him anything about any water problems in building four or about any problems or water leaks, repairs, or temporary repairs in buildings one, two, three or five.

Gerhardt first noticed water problems in late spring, early summer of 1988. At that time, water streamed in through his master bedroom, onto the windowsill. To date, he has wet spots in the plasterboard above the window. Gerhardt experiences these water problems whenever there is a "decent-sized fairly heavy rain."

On cross-examination, Gerhardt stated that he has observed water leaks and damage in 18 other units in building four. He agreed that since 1983, no remedial repairs have been performed on building four.

Sabatino Pavoni testified that he moved into his unit in building four in August 1981 and first experienced water problems in September 1981. The water leaked through two bedroom windows and came down in "a sheet." Pavoni told Bruce, and Bruce said he would take care of the problem. Pavoni stated that Bruce told him that the window probably needed caulking. No action was taken by defendants, and two weeks later, Pavoni had the same leakage problem with the next big rain.

Pavoni stated that no one came to caulk the windows until the summer of 1982. While Pavoni had no water problems during the winter of 1981-1982, the caulking done during the summer of 1982 did not stop the water problems.

Unit owners Morris Eisman, Roger and Edna Peterson, Charlotte Dziacko and Marvin Weiner testified that they observed signs of water infiltration shortly after they moved into their units. They reported the problems to defendants and were told by Bruce that their water problems were specific to their individual units and would be taken care of. Each unit owner testified that he or she currently has water problems in his or her unit.

Several unit owners testified as to cold air penetration through sliding doors during the winter of 1981-1982 (Pavoni, Maynard Duboe, Sol Strauss, Aurelia Garcia, Sylvia Schwartz (stipulated) and Therese Plummer Paul (stipulated)). Plaintiffs-unit-owners also testified that they complained to defendants about wet electrical units, cracks in windowsills and drafts through doors and windows.

F. Defendants' Repair Efforts

Ray testified that all five buildings were experiencing water infiltration problems in August 1932. Prompted by various complaints from unit owners, on August 6, 1982, defendants sent identical letters to Rosenow, Weather Shield Manufacturing, Inc. (the window manufacturer), and Christmann advising them of continued water leakage at Washington Courte and requesting their assistance in solving the problems. The letter stated in part:

> "This letter will serve as notification that the water problem in our development still persists even though we have complied with suggestions you have made to solve this condition.
>
> The last two rains, however, have caused continued leakage and damage to personal property, as it has done from the date of in-

stallation of your work; and from the date of the additional work which we have had you complete. *** You are being put on notice, because more work and more money is being spent by Washington-Golf Corp. in our continuing effort to alleviate this water problem. We are sure there will be many claims by owners for this damage. We must protect ourselves against these claims, as they could possibly be quite extensive. *** We do intend to take whatever measures necessary to solve this problem."

On October 21, 1982, building five sent a letter to defendants describing the unit owners' "deep concern" over Washington-Golf's failure to solve the water infiltration problems existing for over $2^1/2$ years. The letter concluded with a threat of litigation. On October 27, 1982, defendants sent a demand letter to Ciborowski which stated in part:

"We were told that this waterproofing and caulking would definitely alleviate our water problem. It has not. You were notified several times of continuing problems. An attempt was made by you on different occasions to assess and rectify this problem; but the problem still exists

*** You must understand that the failure of all the trades involved in our job site meeting to solve this problem exposes all to lawsuits that would be very costly to defend."

On November 3, 1982, building two sent a letter to Mayor Blase and defendants advising them of ongoing water leakage in building two and "all other buildings." The letter stated that building two had contacted a structural engineer, Jake Ribar, who was to report on the structural problems at a condominium association meeting scheduled for November 10, 1982. The letter requested that defendants "engage Mr. Ribar immediately" to investigate the water problems in building two. Ed attended the November 10, 1982, meeting and agreed to retain Ribar to investigate the water problems in building two.

On December 3, 1982, defendants sent mailgrams to Christmann and Ciborowski which stated: "Please be advised, numerous water leaks still occurring throughout buildings at Washington Courte Condominiums." On December 30, 1982, attorneys for Washington-Golf sent formal notification to Rabin-LeNoble of its intent to institute legal action against the architects for the claims to be filed by the individual unit owners of all five buildings in Washington Courte. The letter stated:

"On behalf of our client, Washington-Golf Corp., *** we herewith serve you additional formal notice of a continuation of the unresolved water leakage problem. *** The water problem had been concentrated over the heads of the windows, passing through

the window frames and casings in the various individual condominium units as *apparently the result of faulty design.* Our client has spent literally thousands of dollars in a continuing effort to solve this problem, but it still persists.

\* \* \*

Because of the exposure of our clients to the claims of individual unit owners, we have no alternative but to engage the services of an engineer to determine the specific cause of the problem \*\*\* we shall look to you to hold our client harmless with respect to the cost incurred in finding a solution to the problem as well as the cost of actually making the necessary corrections.

We have been advised by various unit owners of their intent to file litigation and since you will no doubt be a party to any such litigation, we suggest that you notify your insurance carrier." (Emphasis added.)

On December 21, 1982, Ribar sent another letter to defendants indicating that he could not conduct his investigation until the cold weather improved. By letter dated January 6, 1983, defendants informed building two that Ribar would commence his investigation in the spring. The letter further stated: "We assure you we will proceed to resolve this problem upon advice of the engineer."

On June 20, 1983, Ribar provided a preliminary report to defendants which described his inspections and testing of building two since November 1982. Building two received a copy of this preliminary report.

On August 16, 1983, Ribar sent Ed a letter enclosing his final report. The treasurer of building two, Ronald Siegal, testified that building two never received a copy of the final report from defendants, despite Siegal's request to Ed. Siegal eventually obtained a copy of the report from Pavoni one or two years later after plaintiffs' lawsuit had been filed.

Ribar's final report indicated that the masonry walls were not constructed as designed. Removal of several bricks from the wall disclosed that the collar joint was not filled with mortar. Inspection of buildings two, three, four and five revealed noticeable outward bowing of the east and west end walls, following a spring with cool temperatures. An inspection of August 5, 1983, revealed that expansion of the north and south walls had created irregular, concave bowed surfaces in the east and west end walls, indicative of a considerable amount of movement.

Ribar's investigation of the interior of building two revealed that leaks at the head of bedroom windows, closets, kitchens and the garage walls were the result of faulty workmanship and the absence of

expansion joints, causing voids and cracks in the brick work and thereby permitting water infiltration.

Ribar's report outlined a plan to repair the numerous structural defects identified in building two. Ribar recommended installation of expansion joints and retuckpointing of the entire building. The report specifically stated that "the application of clear-coating water repellents is not recommended." Defendants obtained estimates for the installation of expansion joints, but did not implement any of Ribar's recommendations in building two, or any other building, despite prior assurances that they would do so.

In September 1983, defendants sent identical letters to buildings one, two and three in which they offered to undertake repairs in exchange for a waiver of liability from each building. At that time, none of the buildings accepted defendants' offer.

On September 19, 1983, defendants received a proposal from Rosenow for repairs to the flashing detail on the parapet walls. The proposal contained two alternative repair plans, neither of which comported with Ribar's recommendations. Defendants elected another alternative, which involved repairs to the parapet walls at a cost of $2,000 per building. Ed testified that he was uncertain as to whether the work was actually done on more than one building.

Defendants also received a proposal from United Sealants dated October 31, 1983, to perform spot tuckpointing and to apply water repellant spray on panels above some of the windows in each building. These repairs did not comport with Ribar's recommendations. United Sealants eventually did some of the work outlined in its proposal, but in early 1984 discontinued the balance of the work because the spray sealant was not effective.

In January 1985, defendants paid $25,000 each to buildings two, three and five in exchange for covenants not to sue. Only one of these covenants was offered and admitted into evidence at trial, the covenant signed by building two residents, dated January 2, 1985. Ed testified that building four would not accept $25,000 from defendants for repairs, that they wanted $50,000. As a result of that, negotiations broke down, and building four filed a lawsuit.

G. Plaintiffs' Expert Testimony Regarding Damages

John Frauenhoffer, a registered structural engineer, testified as an expert witness on plaintiffs' behalf regarding damages. Frauenhoffer stated that since 1983, he and his staff have spent approximately 1,900 hours evaluating the condition of building four and formulating an opinion regarding building four's structural problems.

Frauenhoffer stated that he conducted a series of tests on the

interior and exterior walls of building four. On June 23, 1983, Frauenhoffer broke two holes in the drywall of two units, extracted portions of insulation, and found that the insulation was soaked. In April 1984, Frauenhoffer conducted a test on the roof of building four. He cut holes in the roof and examined the roof structure by using an infrared device which detected moisture underneath the top layer of the roof.

In June 1989, Frauenhoffer conducted a rain simulation test to determine the source and extent of water permeance into the building. The testing procedure utilized a sealed-chamber device which was bolted to and sealed against the wall of the building. The testing procedure included the removal of face brick in various locations, which permitted the observation of water migration patterns in the wall interiors and the sufficiency of the solid-filled collar joint detail. Frauenhoffer stated that the test was performed in compliance with the American Society of Testing Materials industry standard.

In addition, Frauenhoffer surveyed the size and location of existing masonry cracks, documented in a "crack map," to determine the causes of the cracking from the exhibited patterns of cracking. Frauenhoffer prepared a report following the water permeance test.

Frauenhoffer also tested the soil to determine whether the masonry cracking in the building was caused by settlement of the building. Frauenhoffer concluded that the soils were adequate. In addition, Frauenhoffer removed coping stones and flashing material on the parapet walls to determine the sufficiency of the through-wall flashing and counter flashing details.

In January 1991, Frauenhoffer performed a final test which involved the removal of face brick and mortar from one location on the east wall of building four. This test revealed the lack of a solid-filled collar joint.

Frauenhoffer testified that the sampling sizes created by his testing procedures formed a statistical basis with an accuracy of 99.3%, meaning that if he "opened up the entire building, 99.3 percent of the building would be found just the way I have described it."

Frauenhoffer identified numerous existing structural defects which, in his opinion, rendered building four not reasonably suited for its intended purpose as a condominium residence. From his test results, Frauenhoffer concluded that: (1) the collar joints in the masonry walls were not filled solid with mortar; (2) expansion joints were not provided in the masonry walls; (3) mortar joints in the face brick and concrete block courses contained holes and voids; (4)

numerous bricks and concrete blocks were cracked; (5) wire reinforcement ties binding the walls together were corroded; (6) lintels and other structural metal embedments in the masonry walls were corroded; (7) steel grillage beams and the steel decking supporting the first floor had corroded; (8) electrical outlets had corroded; (9) drywall damage, rotting window trim and deterioration of window seams had occurred; (10) the top of the masonry walls were capped with unsecured stone; (11) the through-wall flashings under the coping stones, counter flashing and base flashing were inadequate; and (12) flashings and weepholes above windows and other through-wall penetrations were not provided.

Frauenhoffer stated that, in his opinion, the structural defects were neither caused by nor aggravated in any manner by the unit owners. He further stated that maintenance programs were "worthless" because the defects in the structure were "so significant." Frauenhoffer stated that the caulking and tuckpointing work performed by Ciborowski in 1980 was ineffective because the work did not address the inherent structural defects in the building.

Frauenhoffer testified that the defects in the masonry walls could be remedied through "staged recladding," a process which is customary in the industry and necessary in this instance. Recladding involves making the concrete block whole by filling up all of the mortar joints. It is necessary to remove the brick and the drywall on the inside of the building to do that, then to put up new brick, clean the lintels, and put in a new collar joint. Frauenhoffer stated that he has done recladding projects in the past. As for the roof defects, the bad flashing materials must be ripped out to repair the roof surface. Frauenhoffer estimated the total cost of repair at $1.7 million, based on the Means Construction Guide, a national publication used typically for determining costs of construction projects. Frauenhoffer further relied on information from projects he had worked on that involved similar labor estimates.

On cross-examination, Frauenhoffer acknowledged that developers and general contractors customarily rely on architectural plans, and that it is reasonable for a general contractor to believe that plans furnished contain sufficient structural detail. He admitted that the drawings for Washington Courte do not contain any provisions for expansion joints, and flashings over the parapet walls, windows and glass doors. However, he stated that the absence of these details in the plans did not render the plans insufficient, because the flashings are essentially replaced from a weatherproofing point of view by the solid-filled collar joint. Although with a solid-filled collar joint there is still the expectation that some amount of water is going to

migrate into the masonry wall, it migrates through the brick and stops there; that is the design concept.

H. Defendants' Expert Witnesses

Four expert witnesses testified on defendants' behalf. Michael Eiben, an architect, analyzed the architectural plans for the Washington Courte development. Eiben stated that the plans were deficient in several ways. First, the plans failed to provide for expansion control joints. Eiben stated that control joints are necessary within every 50 feet of the wall to prevent cracking when a building moves with temperature changes and settles with time. The plans also omitted flashings over the windows and weepholes, necessary to allow for water to exit the building. Eiben further found that the plans lacked adequate instruction and detail as to the treatment of flashings and counterflashings in the parapet walls.

Eiben then testified as to the sufficiency of defendants' mitigation efforts. Eiben visited the Washington Courte development on three occasions. On his third visit, May 14, 1991, Eiben directed that photographs be taken of similar locations in each building, and he used these photographs at trial to illustrate maintenance efforts in the other buildings. Based on the photographs, Eiben testified that buildings one, two, three and five exhibited the kind of care and maintenance that is required, and that the problems in building four could have been alleviated by the same kind of maintenance.

On cross-examination, Eiben admitted that he did not know either the scope or the timing of the repair work that had been done on the other buildings. Eiben admitted that he had no prior experience with projects involving a barrier wall system, and that he had to call out a representative of the Brick Institute of America to find out the purpose of a solid-filled collar joint. Eiben admitted that he did not analyze the dimensions of the wall to determine whether or not a solid-filled collar joint satisfied any structural aspect of the building. Eiben further stated that he did not open up any part of the wall to determine if there was a solid-filled collar joint inside, nor did he perform any testing on building four to determine the source of water infiltration.

Paul Gordon, a structural engineer, testified that he reviewed the architectural drawings and made four visits to building four, inspecting the exterior masonry walls, portions of the interior masonry walls, the roof, roof drainage and certain units. Gordon stated that he reviewed Frauenhoffer's report and several opinion letters. Gordon stated that the plans should have provided for expansion joints and for flashing details which could have allowed

flexing of the roof perimeters. Gordon also testified that the end walls of the building were exhibiting signs of "bulging" and various lintels were not properly filled with mortar or brick.

Gordon stated that water entered the building because of the lack of weepholes in the masonry, lack of flashing in the masonry wall, improper detailing of the flashing on the roof and improper installation of roof drains, which, as installed, actually acted as plugs and caused water to pond on the roof. Gordon stated that the counter flashing was inadequate and would not operate as a barrier against wind-driven rain. Gordon attributed this problem to a phenomenon called "negative pressure," in which a vacuum is created, necessitating air to be drawn in from the outside. He explained that when the air comes in, water comes in with it because of the pressure. On cross-examination, however, Gordon admitted that he did not do any testing of building four to determine the existence or effects of "negative pressure."

Gordon's recommendations for repair of building four included modifying existing roof drains, anchoring the parapet stones, removing debris from the roof, increasing the air supply through the ventilation throughout the building, tuckpointing, opening lintels and putting in flashing and weepholes and grouting the mortar to fill any voids.

On cross-examination, Gordon conceded that he had not done any study to evaluate the costs of his recommended work. Gordon stated that he had expected that his recommendations would be reviewed by a design professional who would produce a specific plan which would then be let to contractors for bidding. According to Gordon, this process never occurred.

Ned Kimbrel, a roofing contractor, also testified as an expert for defendants. Kimbrel provided cost estimates for certain roof repairs on building four, at the request of Bruce Adreani. Kimbrel performed no testing on the roof, and did not rely in any manner on the conclusions and recommendations of Gordon in formulating his bid, nor did Kimbrel consult a structural engineer. Kimbrel's bid did not contain any guaranty against future water infiltration.

Finally, Manfred Mahler, a masonry contractor, visited building four on four or five occasions and prepared a cost estimate for repair, including tuckpointing, grinding, removal of lintels above the windows, installing flashing and weepholes and replacing brick and sealer. Mahler stated that he is not a structural engineer and he did not undertake to determine the extent of water leakage in the units. Mahler performed no testing on the masonry walls, and did not rely on any of Gordon's conclusions or recommendations in formulating

his bid. In fact, several elements of Mahler's proposal were in direct conflict with Gordon's recommendations. For example, Mahler's repair plan made no provision for the installation of a solid-filled collar joint or mortar in the cracks and voids contained in the inner, load-bearing concrete block course. Mahler stated that the total cost of repair for building four at all four elevations would be $131,120.

## I. Plaintiffs' Rebuttal

### 1. Frauenhoffer

Plaintiffs recalled Frauenhoffer as a rebuttal witness. Frauenhoffer disputed much of Gordon's testimony. For example, regarding "negative pressure," Frauenhoffer stated that it "simply just doesn't exist in this building." As for Eiben's testimony, Frauenhoffer stated that Eiben's photographs failed to depict the actual conditions of building four and were inconsistent with his own observations. Frauenhoffer stated that the photographs portrayed the best parts of the buildings.

### 2. Defendants' Efforts to Reduce Taxes

Plaintiff-unit owner Earl Loeb also testified as a rebuttal witness for plaintiffs. Loeb stated that for several years, he assisted unit owners in Washington Courte in the preparation of their tax assessment reduction forms. Loeb also assembled documentary evidence of problems and repair costs of unit owners and submitted them to the Cook County Board of Tax Appeals.

Loeb testified as to a conversation he had with Bruce in June 1989 during the time Frauenhoffer was performing the water permeance test on building four. Bruce asked Loeb for his assistance in preparing a petition for a tax reduction on two units owned by the Adreanis in building four. Loeb agreed, but told Bruce that he intended to rely on Frauenhoffer's report in connection with the Adreanis' tax petitions. In November 1989, Bruce signed two petitions prepared by Loeb, one for himself and the other on behalf of Ray. The petitions were filed on January 5, 1990.

Henry Wlodyga, secretary of the Cook County Board of Tax Appeals, also testified as a rebuttal witness for plaintiffs. Wlodyga confirmed that the Adreanis received a property tax reduction for 1989 based on Frauenhoffer's report.

Following trial, the jury awarded plaintiffs compensatory damages in the amount of $1,700,000 for breach of express and implied warranties and common law fraud in the sale of condominium units by defendants. Subsequently, the trial court entered judgment against

defendants for statutory fraud under the Consumer Fraud Act. Defendants' post-trial motion was subsequently denied, and this timely appeal followed.

OPINION

A. Appeal from the Judgment Rendered at Trial

Defendants initially contend that the trial court erred in denying their motion for a judgment notwithstanding the verdict (*n.o.v.*), because the verdict for common law fraud was against the manifest weight of the evidence.

It is well established that judgment *n.o.v.* should be entered only where "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.) However, where the evidence demonstrates substantial factual dispute, or assessment of witnesses' credibility or resolution of conflicting evidence may determine the outcome, it is error to enter judgment *n.o.v.* (*Lee v. Grand Trunk Western R.R. Co.* (1986), 143 Ill. App. 3d 500, 492 N.E.2d 1364.) It is the jury's prerogative to draw reasonable inferences and ultimate conclusions from the facts presented, and the verdict will not be disturbed merely because the jury could have found differently or because judges might find other conclusions to be more reasonable. *Lee*, 143 Ill. App. 3d at 512, citing *Jardine v. Rubloff* (1978), 73 Ill. 2d 31, 382 N.E.2d 232.

In applying these principles to the present case, our inquiry is whether plaintiffs produced sufficient evidence to support finding defendants guilty of misrepresenting material facts to plaintiffs with the intent to deceive under a theory of common law fraud and deceit. Defendants contend that plaintiffs failed to prove all of the elements necessary for establishing common law fraud. Defendants argue that they did not know the source of the water problems in any of the buildings; therefore, plaintiffs failed to prove the element of fraudulent intent at trial.

Plaintiffs respond that defendants' true strategy on appeal is to avoid personal liability for fraud in order to force plaintiffs to collect from defendants' corporation, Washington-Golf, which plaintiffs contend is insolvent. While the record is silent as to the status of Washington-Golf, the record does not reflect that any appeal bond was posted on that entity's behalf, or on behalf of Ed Beaulieu.

The basic elements of common law fraud and deceit are: (1) a false representation of a material fact; (2) by a party who knows or

believes it to be false; (3) with the intent to induce a plaintiff to act; (4) action by a plaintiff in reliance on the statement; and (5) injury to the plaintiff as a consequence of that reliance. (*In re Witt* (1991), 145 Ill. 2d 380, 583 N.E.2d 526.) An affirmative statement is not always required, however, and fraud may also consist of the omission or concealment of a material fact if accompanied by the intent to deceive under circumstances which create the opportunity and duty to speak. (*Tan v. Boyke* (1987), 156 Ill. App. 3d 49, 508 N.E.2d 390; *Zimmerman v. Northfield Real Estate, Inc.* (1986), 156 Ill. App. 3d 154, 510 N.E.2d 409.) Whether the plaintiff has proved these elements is determined by the trier of fact, whose decision will not be disturbed unless it is against the manifest weight of the evidence. *Tan*, 156 Ill. App. 3d at 54.

The intent to deceive may also be shown by circumstantial evidence. *Vitale v. Illinois Department of Revenue* (1983), 118 Ill. App. 3d 210, 454 N.E.2d 799, 802; *Mother Earth, Ltd. v. Strawberry Camel, Ltd.* (1979), 72 Ill. App. 3d 37, 50, 390 N.E.2d 393; see also *Warren v. LeMay* (1986), 142 Ill. App. 3d 550, 573, 491 N.E.2d 464 (intent to deceive shown by "the proof of certain facts and circumstances from which the jury may infer other connected facts which usually and reasonably follow according to the common experience of mankind").

A seller has a duty to disclose facts which materially affect the value or desirability of the property, are known or accessible only to him, and that he knows are not known or accessible to a diligent buyer. (*Fleisher v. Lettvin* (1990), 199 Ill. App. 3d 504, 509, 557 N.E.2d 383, 386.) For example, in *Munjal v. Baird & Warner, Inc.* (1985), 138 Ill. App. 3d 172, 485 N.E.2d 855, this court held that it was reasonable for the jury to infer that defendant had prior knowledge that the house he sold to plaintiff had an extensive flooding problem and that plaintiffs relied to their detriment on defendant's silence in not disclosing this fact.

Similarly, an omission of a material fact has been found to constitute fraud. In *Tan*, this court found that defendant's knowledge of the actual facts surrounding five illegal apartment units created a duty to reveal the discrepancies to the plaintiff. Because defendant did not do so, plaintiff showed an intention to deceive, which constituted misrepresentation on defendant's part. *Tan*, 156 Ill. App. 3d at 54; see also *Kinsey v. Scott* (1984), 124 Ill. App. 3d 329, 336-39, 463 N.E.2d 1359 (concealment of actual facts surrounding the construction of a basement apartment showed an intention to deceive and created a duty to speak).

The facts of the present case disclose that defendants, Ed, Ray, and Bruce were officers of Washington-Golf, the corporation, and, as

individuals, were responsible for each phase of the Washington Courte development. The record indicates that defendants undertook to wear three hats for this project, those of the developer, general contractor, and real estate broker. In this respect, the Washington Courte development was not a typical venture, where three separate entities were charged with responsibility for each phase of the project. Defendants here were charged with responsibility for every phase of the project and, therefore, had greater knowledge than the usual developer, general contractor or broker.

A court will find corporate officers personally liable for corporate obligations through a remedy known as piercing the corporate veil. (*Ted Harrison Oil Co. v. Dokka* (1993), 247 Ill. App. 3d 791, 617 N.E.2d 898.) For example, a corporate entity will be disregarded where it would otherwise present an obstacle to the protection of private rights or where the corporation is merely the alter ego or business conduit of the governing or dominant personality. (*Ted Harrison*, 247 Ill. App. 3d at 795.) For a court to pierce the corporate veil (1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, and (2) circumstances must exist such that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences. (*Ted Harrison*, 247 Ill. App. 3d at 795, citing *People ex rel. Scott v. Pintozzi* (1971), 50 Ill. 2d 115, 128-29, 277 N.E.2d 844, 851-52.) Although a corporate officer is not liable for the corporation's torts simply by virtue of his office, corporate officer status does not insulate him from individual liability for the torts of the corporation in which he actively participates. *Stansell v. International Fellowship, Inc.* (1974), 22 Ill. App. 3d 959, 318 N.E.2d 149.

The facts in the present case indicate that Ed and Ray, the officers of Washington-Golf, were proficient in the fields of construction and real estate, as they had a combined total of at least 60 years' experience in these fields. The facts further indicate that Ed and Bruce, another corporate officer, designed and implemented the sales program for the condominiums in Washington Courte and thus were responsible for any representations made, or not made, to prospective purchasers of units. Ray was in charge of the construction of the buildings and frequently visited the job site to monitor the construction work. The record clearly indicates that defendants were possessed of knowledge transcending that normally imputed to corporate officers. The record shows such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer existed and that circumstances existed such that

adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice and promote inequitable consequences. Therefore, it is appropriate to pierce the corporate veil to find that defendants, as individuals, are liable for failure to disclose material facts relating to the desirability of the condominiums.

Defendants argue that there was no evidence that they knew that the architectural plans were defective, but rather that the evidence established defendants' belief that they were solving the water problem in the other buildings. The facts in the record belie defendants' assertions. Again, the record discloses that Ed and Ray are experienced developers familiar with the details of construction. Defendants testified that they had knowledge of the water problems in buildings one, two and five in 1980, prior to the marketing of condominiums in building four, and that by 1982, defendants had knowledge that all of the buildings in Washington Courte had identical water infiltration problems. Defendants engaged Christmann to examine all of the buildings in the development, and Christmann observed water infiltration problems in every building, citing building four as having the worst problems. As a result, defendants decided to retuckpoint and waterproof all of the buildings, including the unoccupied building four, in Ray's words, "just to be sure," because they knew that all of the buildings were designed and built identically, and "we weren't going to take any chances, that's for sure." Even if defendants could not assign a specific cause to the water infiltration problems, defendants were nevertheless aware that the problems existed.

Moreover, the record discloses that defendants engaged structural engineer Jake Ribar to assess the condition of building two on November 10, 1982. Ribar's involvement came about pursuant to a letter sent from building two to Mayor Blase and defendants advising them of ongoing water leakage in building two and all other buildings. Ribar gave a preliminary report to defendants on June 20, 1983, and issued a final report to defendants on August 16, 1983. The final report indicated that the masonry walls in the development were not constructed as designed. The report noted that removal of several bricks from a wall disclosed that the collar joint was not filled with mortar. The report further stated that an inspection of buildings two, three, four and five revealed noticeable outward bowing of the east and west end walls. Ribar's report outlined a plan to repair the numerous structural defects identified in building two. The record reflects that defendants failed to implement Ribar's recommendations.

The record further reflects that defendants sold units in building

four subsequent to their engaging Ribar to assess the problems in the buildings. For example, plaintiffs-unit owners Marvin and Bernadine Weiner viewed units with Sabatino Pavoni in building four in March 1983 and were not informed about any water infiltration problems. The Weiners signed a sales agreement on April 28, 1983, which Bruce also signed as seller, and closed on unit 407 in building four on June 1, 1983.

Defendants' complaint that "no one suggests that Pavoni proceeded with a fraudulent intent to sell units to others" is without merit. Defendants argue that Pavoni, who sold several units on defendants' behalf, had knowledge of the water problems, but that he failed to disclose the problems to prospective purchasers, acting "with the exact same innocent belief [as defendants] that the units were sound." However, the facts show that, unlike defendants, Pavoni is not an experienced real estate broker or developer and has no experience in the construction trade. The facts further indicate that defendants made representations to Pavoni that the water problems were unit-specific and that defendants would take care of the problems. Pavoni testified that he believed and relied on defendants' representations. Finally, even if this court were to discredit Pavoni's testimony, he is a plaintiff, not a defendant, in this matter.

Defendants further argue that the water infiltration was not due to a defect in construction, citing the June 19, 1980, letter from Todd Bavaro, the building inspector for the Village of Niles. Defendants' argument is unavailing. First, Bavaro's letter indicating that "the building is structurally sound and conforms to building codes" refers only to building one. The facts further indicate that Bavaro's inspection was limited to one unit of building one. Additionally, Bavaro did not testify at trial. Defendants' knowledge of the source of the water infiltration problems is in fact supported by defense counsel's letter of December 30, 1982, to Rabin-LeNoble which stated in part that the water problems in the buildings were "apparently the result of faulty design."

Defendants further argue that they were only obliged to disclose to potential purchasers the existence of water infiltration problems if asked. Defendants' theory is a direct affront to the duty imposed upon sellers of property to disclose facts which materially affect the value or desirability of the property, are known or accessible only to the seller, and that the seller knows are not known or accessible to a diligent buyer. Defendants also argue that the evidence at trial established that they acted in good faith in attempting to cure the water problem in the other buildings by hiring Ciborowski to do $30,000 in extra tuckpointing and repair work. However, the record

shows that this work contracted for by defendants was guaranteed for only one year. The evidence at trial in fact disclosed that defendants opted for a temporary solution to the serious water infiltration problems.

Defendants finally argue that they would not have purchased units for themselves in Washington Courte if they thought anything was wrong with the buildings. However, there is nothing in the record to show why defendants purchased these units or whether they purchased the units at a reduced price. The record does indicate that defendants allowed their accountant to purchase a unit at a reduced price. The facts further show that defendants utilized Frauenhoffer's reports, reports that defendants now condemn, to reduce the assessed value of the units they owned.

■ The question as to whether plaintiffs presented evidence to prove that defendants engaged in fraud was one for the jury to decide. The record shows that sufficient facts were presented to the jury for the jury to determine that defendants had knowledge of the deficiencies in building four. The jury here could have determined, based on the evidence presented at trial, that the defendants' attempts to rectify the deficiencies were too little and too late, and that in their feeble attempts to rectify the problems defendants did not make substantial good-faith efforts. It is clear that defendants had a duty to inform prospective purchasers of units in building four that water infiltration problems existed in the buildings. Viewing all the evidence in its aspect most favorable to the plaintiffs, we hold that the jury's finding of fraud on the part of defendants was not against the manifest weight of the evidence. Therefore, the trial court correctly denied defendants' motion for judgment *n.o.v.*

■ Next, defendants contend that the trial court erred by allowing evidence which allegedly suggested that negligent acts were committed by defendants. We note that defendants have not supported their argument by citation to any authority, and therefore this issue is waived. *In re Marriage of Olbrecht* (1992), 232 Ill. App. 3d 358, 597 N.E.2d 635.

Next, defendants contend that the trial court improperly refused to allow evidence of the subsequent sale prices of six condominium units. Defendants cite no authority for this contention, other than to say that admission of evidence is within the discretion of the trial court and will not be reversed unless that discretion has been abused. (*Behrstock v. Ace Hose & Rubber Co.* (1986), 147 Ill. App. 3d 76, 496 N.E.2d 1024.) Defendants have failed to show that the trial court erred in its discretion.

Defendants further contend that the trial court erred in failing

to give the jury an instruction defining "clear and convincing evidence." Defendants argue that the failure to give either of their tendered non-IPI (Illinois Pattern Jury Instructions) jury instructions defining "clear and convincing evidence" was prejudicial.

The record indicates that defendants tendered the following two non-IPI jury instructions:

Defendants' instruction No. 1:

"Clear and convincing evidence means evidence which should leave no reasonable doubt in your mind concerning the truth of the matters at issue."

Defendants' instruction No. 2:

"Clear and convincing evidence means evidence that produces in your mind an abiding conviction that the truth of the factual contentions are highly probable."

Plaintiffs tendered instruction No. 10, which also contained a definition of "clear and convincing evidence." However, the trial court refused to give any definitional instruction, concluding that the term "clear and convincing evidence" was best left undefined.

Non-IPI instructions "should be utilized with caution and only where necessary to provide a fair trial." (*Willhite v. Goodman* (1978), 64 Ill. App. 3d 273, 275, 381 N.E.2d 68, 69.) However, Illinois has no pattern instruction which defines "clear and convincing evidence." This court has stated that the propriety of jury instructions depends upon "whether, taken as a whole, they are sufficiently clear so as not to mislead the jury." (*Curry v. Summer* (1985), 136 Ill. App. 3d 468, 476, 483 N.E.2d 711, 716.) Jury instructions must "fairly and correctly state the law." (*Curry*, 136 Ill. App. 3d at 476.) If instructions correctly state the law, yet would mislead the jury, they must not be given. *In re Estate of Casey* (1987), 155 Ill. App. 3d 116, 507 N.E.2d 962.

In *Casey*, this court found that an instruction defining "clear and convincing evidence" as the quantum of proof "which leaves no reasonable doubt in the mind of the trier of fact" was likely to mislead jurors and cause them to erroneously apply the burden of proof applicable to a criminal case, rather than applying the lesser standard of proof intended by the term. (*Casey*, 155 Ill. App. 3d at 122.) The court concluded that the term "clear and convincing evidence" is best left undefined, but that if it is to be defined, the definition should be one which will aid jurors and clearly distinguish it from the other degrees of proof.

The jury instructions proposed by defendants in the present case would likely have misled the jury, as they are similar to the instruction found misleading in *Casey*. Therefore, defendants were not prejudiced by the trial court's refusal to give defendants' proffered definitional instructions to the jury.

Next, defendants contend that the trial court erred in overruling their objection to plaintiffs' instruction No. 20, on the grounds that this instruction misstates applicable law and that the decision upon which it was based, *Intaglio Service Corp. v. J.L. Williams & Co.* (1981), 95 Ill. App. 3d 708, 420 N.E.2d 634, is factually inapposite to the present case.

Plaintiffs' instruction No. 20 is as follows:

> "In regard to Count I (Breach of Express Warranty) and Count II (Breach of Implied Warranty of Habitability), you are instructed that a general contractor is responsible for the work it guarantees through express or implied warranties, whether the defect is due to the general contractor's work or that of a third person."

In *Intaglio*, the plaintiff entered into a contract with the defendant, a general contractor, to design, build and lease to the plaintiff an engraving plant. The plaintiff sued the defendant for breach of the express warranties, as well as certain implied warranties requiring the defendant to conduct repairs of the building. The trial court granted summary judgment in favor of the defendant.

On appeal, this court reversed and remanded the case for a new trial, holding that a contractor is responsible for work he guarantees whether the defect is due to the contractor's work or that of a third person. *Intaglio*, 95 Ill. App. 3d at 712.

In the present case, the plaintiffs contend that defendants' work did not meet the express and implied warranties contained in the purchase agreements. Under *Intaglio*, defendants are liable for any breach of warranty, even if incurred through the error of third parties.

Defendants cite two cases for the general proposition that an employer of an independent contractor is not responsible in tort for the acts of that independent contractor. In *Kouba v. East Joliet Bank* (1985), 135 Ill. App. 3d 264, 481 N.E.2d 325, the plaintiff sought to impose tort liability upon a bank for trespass, assault, battery and conversion committed by an automobile repossessor hired by the bank. In *J.R. Sinnott Carpentry, Inc. v. Phillips* (1982), 110 Ill. App. 3d 632, 443 N.E.2d 597, plaintiff sued a contractor in negligence for disconnecting the electricity to a freezer during home construction resulting in the loss of meat worth $250.

These cases are distinguishable from the present case on their facts and therefore are unavailing. We therefore find no error in giving plaintiffs' instruction No. 20 to the jury at trial.

Defendants further claim that the jury failed to consider plaintiffs' failure to mitigate damages in making its award to plaintiffs. Defendants argue that plaintiffs have a duty to mitigate

damages under *Williams v. Board of Education of Clinton Community Unit School District No. 15* (1977), 52 Ill. App. 3d 328, 367 N.E.2d 549.

Under Illinois Law, the party asserting nonmitigation of damages bears the burden of proof as to the extent of nonmitigation. (*Pioneer Bank & Trust Co. v. Seiko Sporting Goods, U.S.A. Co.* (1989), 184 Ill. App. 3d 783, 790, 540 N.E.2d 808, 813.) Otherwise, there is no basis for determining the amount of setoff to which a defendant is entitled as a result of plaintiff's nonmitigation of damages. *Dillman & Associates, Inc. v. Capitol Leasing Co.* (1982), 110 Ill. App. 3d 335, 344, 442 N.E.2d 311, 318.

■ In the present case, the jury was instructed that it was defendants' burden to prove the affirmative defense of nonmitigation of damages; however, the record discloses that defendants failed to meet this burden at trial. Frauenhoffer's testimony established that the structural defects to building four were neither caused by nor aggravated in any manner by the unit owners. He further testified that a maintenance program for the building would be worthless, because of the significant defects of the structure.

The record further shows that defendants failed to offer any evidence during trial establishing the extent the alleged damages could have been avoided through reasonable precautionary measures. Defendants' experts testified as to observed signs of deterioration in the masonry walls and roof, but did not distinguish between those conditions that existed at the time of completion of the building and those that had become aggravated over time. Two of defendants' experts, Eiben and Gordon, failed to provide cost estimates for repairs. Defendants' other experts, while submitting bids for repairs, failed to identify costs attributed to aggravation.

The record further shows that defendants' counsel argued extensively in closing argument on the issue of nonmitigation. Thus, even though defendants presented no evidence of nonmitigation, the issue was before the jury to consider. Defendants cannot say at this juncture, when they have not borne their burden, that the jury failed to consider evidence that was not presented.

Defendants further contend that the award returned by the jury was excessive and unsupported by the evidence. Defendants argue that damages predicated upon Frauenhoffer's testimony are clearly excessive because "no reasonable person could believe that plaintiffs are required or that they will systematically remove the load-bearing members of their building, prop up their floors in the meantime and reconstruct the building."

■ A jury's award of damages should not be overturned unless it

is against the manifest weight of the evidence or palpably erroneous. (*Greco v. Coleman* (1985), 138 Ill. App. 3d 317, 485 N.E.2d 1118.) It is well settled that where a builder has provided less than full performance, the correct amount of damages is the cost of correcting the defective condition. (*Park v. Sohn* (1982), 89 Ill. 2d 453, 464, 433 N.E.2d 651, 657; *Matich v. Gerdes* (1990), 193 Ill. App. 3d 859, 865-67, 550 N.E.2d 622, 625-27.) The evidence need only tend to show a basis for the computation for damages with a fair degree of probability. (*Posner v. Davis* (1979), 76 Ill. App. 3d 638, 395 N.E.2d 133.) The jury's award should thus be upheld if it falls within the range of estimates given by expert witnesses. *Society of Mount Carmel v. Fox* (1980), 90 Ill. App. 3d 537, 543, 413 N.E.2d 480.

■ In the present case, plaintiffs' expert, John Frauenhoffer, testified as to an estimated cost of repair of $1,700,000. Frauenhoffer based his estimate on approximately 1,900 hours of investigation of the building damage over a period of eight years. Frauenhoffer's cost estimates were unchallenged by defendants' experts at trial.

The record discloses that defendants offered no evidence to contradict Frauenhoffer's testimony regarding his remedial plans for the building and estimated costs. As such, the jury's award was proper.

Defendants' final contention pertaining to the trial is that the trial court erred in entering judgment in favor of plaintiffs under the Consumer Fraud Act. Defendants argue that the evidence at trial failed to establish that defendants engaged in "actual deception," but rather established only that defendants "erroneously" believed that the water infiltration problems were minor and easily correctable.

■ The elements of the statutory cause of action under the Consumer Fraud Act are: (1) a deceptive act or practice including concealment or omission of any material fact; (2) defendants' intent that plaintiffs rely on the concealment; and (3) that the concealment occurred in the course of conduct involving trade or commerce. (Ill. Rev. Stat. 1991, ch. 121$\frac{1}{2}$, par. 262 (now 815 ILCS 505/2 (West 1992)).) This court has held that section 2 expands a consumer's rights beyond those of the common law, providing broader protection than does the common law action of fraud. (*Zinser v. Rose* (1993), 245 Ill. App. 3d 881, 888, 614 N.E.2d 1259; *Rubin v. Marshall Field & Co.* (1992), 232 Ill. App. 3d 522, 533, 597 N.E.2d 688, 695.) As such, a plaintiff need not establish every element of fraud, *e.g.*, a plaintiff need not show actual reliance or diligence in ascertaining the accuracy of misstatements. (*Munjal*, 138 Ill. App. 3d 172, 485 N.E.2d 855.) The good faith or bad faith of a seller is irrelevant under the Act; consequently, a plaintiff can recover for an innocent misrepresentation. (*Munjal*, 138 Ill. App. 3d at 183.) Thus, a determination

that a plaintiff has established a *prima facie* case of fraud under the common law is sufficient to warrant the conclusion that the same acts violate the Consumer Fraud Act. (*Carter v. Mueller* (1983), 120 Ill. App. 3d 314, 457 N.E.2d 1335.) This court has characterized concealment of matters relating to water infiltration, prior repairs and other defects in a residential building sufficient to state a cause of action under the Consumer Fraud Act. *Zimmerman v. Northfield Real Estate, Inc.* (1986), 156 Ill. App. 3d 154, 168-69, 510 N.E.2d 409.

The authority relied upon by defendants is misplaced. For example, in *Harkala v. Wildwood Realty, Inc.* (1990), 200 Ill. App. 3d 447, 452-54, 558 N.E.2d 195, 200, this court found that where a real estate broker had no knowledge of impairments in a home concealed by the sellers, the broker was not liable for fraud under the Consumer Fraud Act. Similarly, in *Lidecker v. Kendall College* (1990), 194 Ill. App. 3d 309, 316, 550 N.E.2d 1121, 1125, plaintiffs-nursing students sued their college and college officials under the Consumer Fraud Act after discovering that the nursing program was unaccredited. This court found that the plaintiffs neither presented any evidence that proved that the college intended to deceive or induce the plaintiffs to attend nursing school by omitting to tell them that the college was not accredited, nor that the plaintiffs relied on such an omission. *Lidecker*, 194 Ill. App. 3d at 315, 550 N.E.2d at 1124.

■ In the present case, the jury determined that plaintiffs established a *prima facie* case of fraud against defendants, sellers of condominium units in building four, for failing to disclose the water infiltration problems to prospective purchasers. The record shows that defendants knew of the history of water infiltration problems in Washington Courte, that they were threatened with litigation, that they made short-term repairs which proved to be unsuccessful, and that water infiltration problems continued during the time defendants sold units in building four to plaintiffs-unit owners. The plaintiffs need not have established the element of intent for the trial judge to find the defendants liable under the Consumer Fraud Act. We therefore find defendants' contention without merit, and affirm the trial court's finding of liability under the Consumer Fraud Act.

B. Plaintiffs' Cross-Appeal

In their cross-appeal, plaintiffs contend that the trial court erred in denying their request for attorney fees in its order of August 22, 1991. Plaintiffs argue that attorney fees are proper under section 10a(c) of the Consumer Fraud Act.

Section 10a(c) of the Consumer Fraud Act states:

"In any action brought by a person under this Section, the Court

may \*\*\* award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party." (Ill. Rev. Stat. 1991, ch. 121¹/₂, par. 270a(c).)

The question of whether to award attorney fees is within the sound discretion of the trial court. *Haskell v. Blumthal* (1990), 204 Ill. App. 3d 596, 561 N.E.2d 1315.

■ In denying plaintiffs' request for attorney fees, the trial court relied on criteria set forth in *Haskell*. This criteria included: (1) whether the defendants had acted in bad faith and (2) whether an award of attorney fees would deter others from acting similarly under similar circumstances. The trial court stated that the defendants had acted with "stupidity" as opposed to bad faith, and that the award of "1.8 [*sic*] million \*\*\* is enough to deter anybody," under the circumstances.

Plaintiffs argue that the trial court failed to consider all of the criteria set forth in *Haskell* in making its determination to deny attorney fees. We disagree.

The *Haskell* court looked to the criteria set forth in *Zervos v. Solo Cup Co.* (1987), 165 Ill. App. 3d 809, 520 N.E.2d 823, a case involving section 502(g) of the Employee Retirement Income Security Act (ERISA) (29 U.S.C. § 1132 (1988)) to determine the criteria for award of attorney fees under section 10a(c) of the Consumer Fraud Act. The *Zervos* court established the following guidelines:

" '(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of fees; (3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' position.' " (*Zervos*, 165 Ill. App. 3d at 812, quoting *Hummell v. S.E. Rykoff & Co.* (9th Cir. 1980), 634 F.2d 446, 453.)

The *Zervos* court continued:

"Not one of these guidelines is necessarily decisive. [Citation.] A showing of bad faith is not required to justify an award of attorney fees. [Citations.] As a general rule, a prevailing party in an ERISA action should be awarded her fees unless special circumstances would render such an award unjust. [Citation.]" *Zervos*, 165 Ill. App. 3d at 812.

The *Haskell* court differentiated between award of attorney fees under ERISA and under the Consumer Fraud Act. As illustration, the court noted that most of the statutes enacted providing for attorney fees have been enacted to give plaintiffs remedies which would not be otherwise available or which a plaintiff might not

otherwise be able to afford. For example, if a consumer is defrauded of a small amount, that consumer may be reluctant to bring an action if the recovery would be nearly or completely consumed by attorney fees. The court continued:

> "We have difficulty in envisioning a circumstance arising under the [Consumer Fraud] Act where fees should be awarded a defendant absent bad faith on the part of a plaintiff. *** [T]he purpose of awarding fees to a defendant is to deter bad-faith conduct by a plaintiff and to reimburse a defendant when that occurs." (*Haskell*, 204 Ill. App. 3d at 602.)

Thus, the criteria set forth in *Haskell* primarily hinge on a determination of bad faith. The *Haskell* court did not adopt *per se* all of the guidelines set forth in *Zervos*. It is clear from the guidelines that a number of them could only apply to ERISA cases. Accordingly, the trial court considered the proper criteria in denying plaintiffs' request for attorney fees.

### C. Appeal from Dismissal of Defendants' Third-Party Action

As noted above, plaintiffs filed their original lawsuit against defendants on June 30, 1983. On June 28, 1985, defendants filed a counterclaim against Rabin, Rosenow and Christmann (third-party defendants) for failure to perform contractual obligations owed to defendants relating to the construction of building four, and also alleged third-party defendants' negligent design and construction of building four. Third-party defendants were dismissed as direct defendants based on the *Moorman* economic loss doctrine. (See *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, 435 N.E.2d 443 (barring recovery in tort for solely economic loss where recovery lies in contract).) Thereafter, defendants recaptioned their counterclaim as a third-party complaint. Defendants' third-party complaint was subsequently amended to add a cause of action for breach of contract.

The record indicates that the substantive facts pertinent to discussion of defendants' third-party action are the same as that evidence presented at the trial on plaintiffs' fraud claim. Therefore, we need not restate those facts here.

Procedurally, the record indicates that in July 1990, the third-party defendants filed motions for summary judgment, contending that the second amended third-party complaint was time barred under the construction statute of limitations set forth in the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 13—214(a)). On August 28, 1990, the trial court, Judge Berman presiding, heard argument on the third-party defendants' motions. On September 5,

1990, Judge Berman denied the motions for summary judgment, finding that the statute of limitations for a third-party complaint alleging breach of contract or seeking contribution did not commence until the filing of the underlying complaint. Judge Berman also expressly found that defendants knew of building four's defects before plaintiffs' suit was filed and defendants knew that they had potential claims against various subcontractors.

On September 12, 1990, Judge Berman entered an agreed order dismissing the contribution counts with prejudice, pursuant to Rosenow's motion, which was joined by the other third-party defendants. The only remaining cause of action against third-party defendants was for breach of contract.

The third-party defendants moved for reconsideration of denial of their motion for summary judgment asserting that defendants' third-party claim was for breach of contract and, thus, subject to the discovery rule provided in section 13—214(a). Defendants responded that they were not damaged or even potentially damaged until plaintiffs filed their complaint on June 30, 1983.

On November 20, 1990, Judge Berman denied third-party defendants' motion for reconsideration. However, Judge Berman found that there existed a question of law for which there was a substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation. Third-party defendants filed an application for leave to appeal to this court pursuant to Supreme Court Rule 308 (134 Ill. 2d R. 308). This application was denied.

Defendants subsequently filed a third amended third-party complaint on May 3, 1991. Third-party defendants moved to dismiss this third amended complaint. On May 17, 1991, the circuit court, Judge Wolfson presiding, granted the third-party defendants' motion to dismiss the third amended third-party complaint, finding that the third-party complaint seeking contribution and implied contractual indemnity was barred by the statute of limitations set forth in section 13—214(a) and that Judge Berman had erred in denying the third-party defendants' prior motion to dismiss the action. Judge Wolfson found that there was no just reason to delay enforcement or appeal of the dismissal order pursuant to Supreme Court Rule 304(a).

Defendants filed a timely petition for reconsideration which was denied by Judge Wolfson in an order entered June 24, 1991. Judge Wolfson further found there existed no just reason to delay enforcement or appeal of the order pursuant to Rule 304(a). Defendants' timely appeal of these two orders followed.

Defendants contend that the trial court erred in dismissing their

third-party complaint as time barred by section 13—214(a). Section 13—214(a) provides:

"(a) Actions based upon tort, contract or otherwise against any person for an act or omission of such person in the design, planning, supervision, observation or management of construction, or construction of an improvement to real property *shall be commenced within 2 years from the time the person bringing an action, or his or her privity, knew or should reasonably have known of such act or omission.*" (Emphasis added.) Ill. Rev. Stat., 1982 Supp., ch. 110, par. 13—214(a).[2]

Defendants assert, based on the holding in *Anixter Brothers, Inc. v. Central Steel & Wire Co.* (1984), 123 Ill. App. 3d 947, 463 N.E.2d 913, that because an action for implied indemnity is a distinct cause of action, it is not subject to the statute of limitations that pertains to the underlying claim.

In *Anixter*, the plaintiff sued defendant Central Steel for selling it defective brass tubing. Central Steel then brought a third-party action for indemnity against Bridgeport, the supplier of the tubing. The trial court dismissed Central Steel's third-party complaint on the ground that it was time barred under the four-year limitation period for bringing an action set forth in section 2—725(1) of the Uniform Commercial Code (UCC) (Ill. Rev. Stat. 1983, ch. 26, par. 2—725(1)). On appeal, this court reversed, finding that the limitations period for a claim based on an implied contract of indemnity is governed by the general five-year statute of limitations in section 13—205 of the Code of Civil Procedure, rather than the UCC, because "an implied contract of indemnity action is not a contract action." (*Anixter*, 123 Ill. App. 3d at 953.) According to the court, a "cause of action for an implied contract of indemnity does not accrue until the defendant has a judgment entered against him or until he settles the claim made against him." *Anixter*, 123 Ill. App. 3d at 953.

However, in *Ashley v. Evangelical Hospitals Corp.* (1992), 230 Ill. App. 3d 513, 594 N.E.2d 1269, this court rejected the proposition set forth in *Anixter*. In *Ashley*, the third-party plaintiff hospital sued certain individual doctors for indemnification. One of the third-party claims, asserted against Dr. Caburnay, alleged that he was responsible for implied tortious indemnity. Another third-party claim, against Dr. Kintanar, alleged that he was liable for express contractual indemnity. This court found that regardless of the theory on which the third-party action was predicated, whether tort or contract, the

---

[2]The two-year period was subsequently amended effective September 18, 1985, to four years. Ill. Rev. Stat. 1985, ch. 110, par. 13—214(a).

third-party actions are governed by the statute of limitations applicable to the plaintiff's action. (*Ashley*, 230 Ill. App. 3d at 520, citing *Hayes v. Mercy Hospital & Medical Center* (1990), 136 Ill. 2d 450, 557 N.E.2d 873.) The court found that indemnity operates similarly to contribution, in that "[a] contribution claim may be asserted by a 'separate action before or after payment' *** where no suit is pending which was initiated by the injured party; however, where there is a pending action, the contribution claim should be asserted 'by counterclaim or by third-party claim' *in that action.*" (Emphasis in original.) *Ashley*, 230 Ill. App. 3d at 520, quoting *Laue v. Leifheit* (1984), 105 Ill. 2d 191, 196, 473 N.E.2d 939.

Thus, third-party defendants argue that the two-year statute of limitations in section 13—214 is applicable to this case, as it governs the time parameters of any corresponding third-party claim, regardless of the theory upon which the third-party action is based. In *Hartford Fire Insurance Co. v. Architectural Management, Inc.* (1987), 158 Ill. App. 3d 515, 511 N.E.2d 706, and *La Salle National Bank v. Edward M. Cohon & Associates, Ltd.* (1988), 177 Ill. App. 3d 464, 532 N.E.2d 314, this court found that section 13—214's statute of limitations for construction "actions based upon tort, contract or otherwise" also controlled the time in which counterclaims and third-party complaints for contribution could be filed.

Following the holdings in *Hartford* and *La Salle*, this court found, in *Board of Library Directors v. Skidmore, Owings & Merrill* (1991), 215 Ill. App. 3d 69, 574 N.E.2d 869, that the statute of limitations set out in section 13—214 applies to third-party actions for indemnification which are filed in cases covered by that section of the Code of Civil Procedure.

*Library Directors* is similar to the present case. There, plaintiff contracted with Skidmore in 1975 for architectural and engineering services related to a remodeling project. In July 1977, plaintiff contracted with Wil-Freds to act as general contractor for the library addition and remodeling. Wil-Freds subcontracted the library masonry work to Ringbloom and subcontracted other portions of the construction work to other contractors.

In 1978, the masonry walls exhibited a condition known as "efflorescence," a sign that trapped water is leaking through the wall and that there is unwanted salt in the masonry material.

In October 1978, plaintiff and Skidmore discussed the efflorescence problem. In April 1979, Skidmore sent a proposed change order to plaintiff to authorize the sealing of the masonry walls. In May 1979, Skidmore distributed to the plaintiff a list of noted continued efflorescence.

In June 1979 plaintiff and technical representatives inspected the efflorescence problem. Subsequent inspections, analyses, and reports continued through October 1983.

On December 12, 1984, plaintiff filed its complaint against Skidmore and Wil-Freds, alleging breach of contract and architectural malpractice. Wil-Freds brought its third-party complaint seeking indemnification from Ringbloom on July 22, 1988.

The court found that Wil-Freds should have "discovered" the masonry problems no later than 1978. Therefore, the court affirmed dismissal of Wil-Freds' action against Ringbloom for failure to file within the four-year statute of limitations set forth in section 13—214(a). *Library Directors*, 215 Ill. App. 3d at 74-75.

■ The present case requires the same result as *Library Directors*. The facts show that defendants were aware of water problems as early as 1979 in the Washington Courte development and were aware of water problems in building four in 1980. Defendants' correspondence to third-party defendants, *e.g.*, the August 6, 1982, mailgrams sent to Ciborowski, Rosenow and Christmann, notifying them that: "You are being put on notice. *** We are sure that there will be many claims by owners for water damage. We must protect ourselves against these claims, as they could be possibly quite extensive"; and defense counsel's December 30, 1982, letter to Rabin-LeNoble stating, *inter alia*, "We have been advised by various unit owners of their intent to file litigation," because of the "water problem," clearly indicates that defendants had discovered the problems by 1982. However, defendants failed to file their initial counterclaim/third-party complaint against third-party defendants until June 28, 1985, far more than two years after defendants discovered the water problems.

Although defendants have urged this court not to follow *Library Directors*, the cases cited by defendants are distinguishable. For example, in *Henderson v. Jones Brothers Construction Corp.* (1992), 234 Ill. App. 3d 871, 602 N.E.2d 16, Henderson sought damages for back injuries he allegedly sustained while working at the American Airlines construction site at O'Hare International Airport, filing a complaint on August 25, 1986. American was served with the complaint on August 29, 1986. On September 4, 1986, Olav Eklund, American's corporate insurance manager, received a copy of the summons and complaint and at that time learned of plaintiff's injury.

On June 22, 1990, Jones Brothers filed a third-party complaint for contribution against Peabody Midwest Construction alleging that, at the time of the occurrence, Henderson was performing work under Peabody's direction. On September 12, 1990, American filed its

counterclaim for contribution against both Jones Brothers and Peabody. Under these facts, this court found the date of Eklund's receipt of plaintiff's original complaint, September 4, 1986, to be the trigger date for the section 13—214(a) limitations period. American first discovered Henderson's injury when it received his complaint on this date; therefore, American's third-party action should have been filed by September 4, 1990. *Henderson,* 234 Ill. App. 3d at 874.

*Henderson* is distinguishable from the present case. Defendants here discovered the water problems years prior to being served with plaintiffs' complaint and failed to file a third-party action until the two-year discovery statute of limitations had expired. A litigant can only claim the benefit of the extended period of limitations, up to the period of repose, if he has not discovered the wrongful conduct or injury upon which his third-party claim is predicated. (*Knox College v. Celotex Corp.* (1981), 88 Ill. 2d 407, 416, 430 N.E.2d 976, 979-80.) We therefore find proper the trial court's dismissal of defendants' third-party complaint.

For all of the reasons stated above, the judgment of the trial court is affirmed.

Affirmed.

O'CONNOR, J., concurs.

JUSTICE BUCKLEY, concurring in part and dissenting in part:
I concur with the majority's conclusions on the following issues which defendants raised in their appeal from the judgment rendered at trial and the trial court's order denying their post-trial motions: that the trial court did not abuse its discretion in refusing to allow evidence regarding the subsequent sales prices of certain condominium units; that plaintiffs' jury instruction No. 20 was not improperly given to the jury; that the jury did not improperly fail to consider plaintiffs' failure to mitigate damages when making its award; that the jury's award was supported by the evidence; and that defendants waived the assertion that they were prejudiced when the trial court allowed plaintiffs to introduce certain evidence at trial which allegedly suggested that negligent acts were committed by defendants. I also agree with the majority's finding on plaintiffs' cross-appeal that the trial judge did not err in denying plaintiffs' motion for attorney fees and costs.

I must dissent, however, from that portion of the majority opinion which affirms the findings of common law and statutory fraud against defendants. First, I believe that plaintiffs failed to show by clear and

convincing evidence that defendants were guilty of fraud. Therefore, defendants were entitled to judgment notwithstanding the verdict on the common law fraud count and the judge erred in entering judgment in favor of plaintiffs under the Consumer Fraud Act. Second, I cannot agree with the conclusion that defendants were not prejudiced by the trial court's refusal to give the jury an instruction on the "clear and convincing" standard. Defendants were clearly prejudiced by the failure to give such an instruction as illustrated by the fact that they were found liable for fraud where there was otherwise insufficient evidence to support such a conclusion. Finally, the majority's decision to affirm the trial judge's order dismissing defendants' third-party complaint against the third-party defendants, Rabin LeNoble & Associates, Zorak Rabin, Daniel LeNoble, Hans Rosenow Roofing Co., and A. Christmann & Co., Inc., pursuant to section 2—619 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 2—619 (now 735 ILCS 5/2—619 (West 1992))), on the ground that it was barred by the two-year construction statute of limitations, is contrary to the recently enacted amendment to section 13—204 of the Code of Civil Procedure, existing case precedent and common sense.

## I. COMMON LAW FRAUD

Defendants' liability for fraud was premised on the determination that they knew that the building had substantive defects when they sold units to plaintiffs and that they concealed this fact. Plaintiffs argued that defendants knew they could not correct the leaking problems and that all their efforts were really intended only to temporarily conceal the inherent structural defects in the building while they marketed units to unsuspecting buyers. In my opinion, however, this conclusion does not "hold water" and defendants were entitled to a judgment notwithstanding the verdict on the finding of common law fraud.

In order for a plaintiff to show that a misrepresentation rose to the level supporting a finding of common law fraud, plaintiff must demonstrate that (1) the false statement was one of material fact, (2) the defendant knew or believed that the statement was untrue, (3) the plaintiff believed the statement, relied on the statement and had a right to do so, (4) the defendant intended the plaintiff to act in reliance on the statement, and (5) plaintiff's reliance on the statement led to his injury. (*Mother Earth, Ltd. v. Strawberry Camel, Ltd.* (1979), 72 Ill. App. 3d 37, 48, 390 N.E.2d 393, 403.) The concealment or omission of a material fact also rises to the level of fraud if accompanied by *scienter*, deception and injury. (*Dietrich v. Jones* (1988), 172 Ill.

App. 3d 201, 206, 526 N.E.2d 450, 454.) In other words, defendant must have concealed the material fact "with the intent to deceive under circumstances creating an opportunity and duty to speak." (*Wright v. Richards* (1986), 144 Ill. App. 3d 450, 457, 494 N.E.2d 1269, 1274.) Although the intent to deceive may be shown by circumstantial evidence (*Wright*, 144 Ill. App. 3d at 457, 494 N.E.2d at 1274), all men are presumed honest and fraud must be proven "by such clear and convincing evidence that the mind is well satisfied the charge is true." (*Allensworth v. Ben Franklin Savings & Loan Association* (1979), 71 Ill. App. 3d 1041, 1044, 389 N.E.2d 684, 687.) This standard requires proof greater than does the traditional civil standard of a preponderance of the evidence, but less than proof beyond a reasonable doubt. *Munjal v. Baird & Warner, Inc.* (1985), 138 Ill. App. 3d 172, 179, 485 N.E.2d 855, 861.

Whether the elements of fraud have been proven is a determination for the trier of fact which will not be disturbed unless contrary to the manifest weight of the evidence. (*Munjal*, 138 Ill. App. 3d at 179, 485 N.E.2d at 862.) A judgment is not against the manifest weight of the evidence, however, merely because there is sufficient evidence to support a contrary verdict or because the reviewing court, if it had been the trier of fact, would have reached a different conclusion. (*Fleisher v. Lettvin* (1990), 199 Ill. App. 3d 504, 509, 557 N.E.2d 383, 386.) The proper scope of inquiry is simply "whether there is sufficient credible evidence in the record to support the jury's verdict." (*Dietrich*, 172 Ill. App. 3d at 207, 526 N.E.2d at 454.) "Verdicts and judgments are only considered against the manifest weight of the evidence where a conclusion opposite to that reached by the jury is clearly evident or the jury's verdict is palpably erroneous." (*Dietrich*, 172 Ill. App. 3d at 207, 526 N.E.2d at 454.) In this case, the jury's verdict on the issue of fraud cannot be sustained on any evidence in the record and is palpably erroneous.

The only place in the record to which plaintiffs cite in support of their contention that defendants *knew* that the subcontractors they hired to construct the buildings were not following the building plans and that they were not filling the collar joints with mortar was a portion of defendant Ray Adreani's testimony. During cross-examination, plaintiffs' counsel elicited the following testimony:

> "PLAINTIFFS' COUNSEL: And in fact you learned that in Building No. 4 that collar joint is not filled solid with mortar, right?
> RAY ADREANI: *That's what you told me.*
> PLAINTIFFS' COUNSEL: Is that the truth?
> RAY ADREANI: Maybe it is in a couple of spots. Fine. Its [*sic*]

hard to get the mortar all the way down 2 feet of block." (Emphasis added.)

Contrary to plaintiffs' assertions, this testimony does not support the conclusion that defendants knew the collar joint in building four was not filled solid with mortar. When asked whether he knew the collar joint was not filled solid with mortar, defendant responded, "That's what you told me." He did not say "yes." His subsequent testimony that, "Maybe it is in a couple of spots," was not an admission of knowledge of the fact. Defendant merely accepted plaintiffs' counsel's contention as possible, but did not say that he knew plaintiffs' assertion to be the truth.

Additionally, no other evidence in the record even comes close to showing that defendants knew or believed that the building had inherent structural defects when they were selling the units. Nor can this knowledge be inferred from the problems with the buildings. Defendants were the developers and general contractors of the Washington Courte condominiums. As such, they subcontracted to others to design and construct the buildings. Frauenhoffer, plaintiffs' own expert, testified that developers and general contractors customarily rely on architectural plans and that it is reasonable for a general contractor to do so. Additionally, the architectural plans, which called for all collar joints to be filled solid with mortar, were approved by the Village of Niles. (Although the letter from the Village of Niles building director specifically referred to building one, there was testimony in the record that the plans for all of the Washington Courte condominium buildings were identical.)

After several of the condominium buildings were constructed, cracks developed in the north wall of building one and there were incidents of water leaking problems in all the buildings. Although defendants apparently were slow in responding to complaints, they did take steps to correct the problems. After a meeting with the housing department of Niles in response to a complaint by the Building One Condominium Association, defendants agreed to apply "Camtex, which is the most effective and expensive product on the market, on the exterior north wall, and a possible solution to alleviate the problem." The building director of the Village of Niles also wrote a letter to the Building One Condominium Association which stated that the cracked bricks in the north wall were not due to a construction fault, but that "due to settlements the brick in fact cracked allowing heavy rains to seep into the building and therefore caused the apartments to have some water damage." The letter further asserted:

"Upon our inspection, we have found that the entire building

meets with the approval of this department, the building commissioner, and the Village of Niles and that the building is structurally sound and conforms to the blueprints as well as the village codes."

In late 1980, defendants hired Bruce Ciborowski to repair all the Washington Courte buildings by, *inter alia*, tuckpointing, waterproofing, and caulking. The cost of these repairs was approximately $30,000. The success of these repairs could not be determined, however, until the spring rains of 1981. Subsequently, during the spring rains of 1981, the water leaking problems continued. Defendants only undertook to make limited repairs during 1981. In late 1982, defendants contacted the roofing company, the architect and the mason in order to request their cooperation in remedying the water leakage problems. They also demanded that the mason reseal the buildings at his expense.

In November 1982, the Building Two Condominium Association requested that Jack Ribar, a structural engineer, investigate the water leakage problem and defendants agreed to hire Ribar to do so. Defendants informed building two that, due to cold weather, Ribar would commence his investigation in the spring and that they "would proceed to resolve this problem upon the advice of the engineer." In the spring of 1983, the Building Four Condominium Association hired John Frauenhoffer, also a registered structural engineer, to investigate the water leakage problem.

On June 20, 1983, Ribar sent his preliminary findings to defendants. He stated that he had made nine inspections of building two since mid-November 1982. He also described the tests he had conducted and informed defendants of the tests he planned to conduct in the future in order to "pinpoint the major sources of water infiltration in this building." Nowhere in the letter did Ribar raise the possibility or even intimate that the leaks were due to a structural defect in the building. At a building four association meeting on June 23, 1983, Frauenhoffer related his preliminary finding after two visits to the site that "there must be some structural defect inside that's causing that much water to gain entrance that far into the wall." Based upon Frauenhoffer's preliminary conclusion, building four decided to file a lawsuit. On June 30, 1983, Washington Courte Condominium Association-Four filed its original complaint against defendants. Subsequently, on August 16, 1983, Ribar sent defendants his report in which he concluded that the building was defectively constructed as a result of faulty workmanship.

Based upon this evidence, it was not shown by clear and convincing evidence that defendants committed fraud by concealing

their knowledge that the buildings were structurally unsound. Defendants had a right to rely upon the architectural plans and the fact that those hired to construct the buildings would follow the plans. The fact of water leakage and cracks in the outer walls of several buildings does not automatically lead to the conclusion that the buildings themselves were defective and that any attempts to correct the problems would be unsuccessful. In fact, after the leaks and cracks surfaced in building one, the Village of Niles conducted an investigation and concluded that the building was "structurally sound." Additionally, Ribar, the structural engineer hired by defendants at the behest of the Building Two Condominium Association, did not conclude that the building was defective until two months after the litigation had begun. In his initial report in June, he did not even raise the possibility that the building was defective. Only Frauenhoffer concluded in his preliminary finding that building four "must be" structurally defective and this was just one week prior to the filing of plaintiffs' complaint. Subsequently, after the complaint was filed, Frauenhoffer and his staff spent approximately 1,900 additional hours testing the condition of the building before Frauenhoffer could determine to a reasonable degree of engineering certainty the source of the problem. Clearly, the knowledge or belief that the building was structurally unsound cannot be attributed to the defendants at the time they were selling the units. The expert they hired did not even reach the conclusion that the cause of the problems was faulty workmanship until after the litigation had begun and after he had completed extensive tests over an 11-month period. Additionally, Frauenhoffer only came to his conclusion one week prior to the filing of the initial complaint in this case which was well after the last unit had been sold. Consequently, the determination that defendants committed fraud in concealing the structural defects in the building was not clearly evident and was against the manifest weight of the evidence.

I also do not believe that it is "clearly evident" that a finding of fraud can be supported by defendants' failure to disclose to some potential buyers that there had been incidents of leakage in other units and buildings or by their assurances to other buyers that the problems were being repaired. Plaintiffs cite several cases in which homeowners have been found to have fraudulently represented to purchasers that water infiltration problems in their homes had been cured. (See *Dietrich v. Jones* (1988), 172 Ill. App. 3d 201, 526 N.E.2d 450; *Munjal*, 138 Ill. App. 3d 172, 485 N.E.2d 855.) In both cases, however, there was evidence in the records that the homes had experienced significant leakage problems over a number of years and

the owners had been unable to correct the problems. In fact, the owners in these cases had ceased their attempts to fix the problems and, with the belief that the homes were in some manner structurally unsound, were concealing the problems in order to pass them off to unsuspecting purchasers. As the *Munjal* court stated, "[defendant's] failure to disclose the full extent of the problem was an attempt to deceive plaintiffs in order to induce them to purchase the property for a value that did not include the defect." *Munjal*, 138 Ill. App. 3d at 180-81, 485 N.E.2d at 863.

In light of the fact that defendants in the instant case had no reason to believe that the buildings themselves were structurally defective, they had no reason to believe that the measures being taken to control the leakage problems would be unsuccessful or that the leakage would affect the value of the units. Thus, plaintiffs failed to show that defendants knew or believed that their statements or omissions were untrue. Moreover, I do not believe that sufficient evidence was presented which tended to show that defendants made an effort to conceal water damage from either prospective purchasers or new owners. Mr. Pavoni, a plaintiff and a salesman of units in building four, testified that he was never told to deny water leakage problems and, at one point, was specifically told not to sell any unit with existing water damage. Consequently, defendants did not have a duty to disclose the possibility or fact of the leakage and that a finding of fraudulent concealment of these facts is not clearly evident. Therefore, defendants were entitled to a judgment notwithstanding the verdict on the common law fraud count.

## II. STATUTORY FRAUD

I also believe that the trial court erred in finding a violation of the Consumer Fraud Act. The reasoning and conclusions I have set forth above equally apply in this case to preclude defendants' liability under the Consumer Fraud and Deceptive Practices Act (the Act) (Ill. Rev. Stat. 1991, ch. 121$\frac{1}{2}$, par. 261 *et seq.* (now 815 ILCS 505/1 *et seq.* (West 1992))). The Act was intended to protect consumers against fraud, unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce (Ill. Rev. Stat. 1991, ch. 121$\frac{1}{2}$, par. 261 *et seq.* (now 815 ILCS 505/1 *et seq.* (West 1992))), and section 2 of the Act (Ill. Rev. Stat. 1991, ch. 121$\frac{1}{2}$, par. 262 (now 815 ILCS 505/2 (West 1992))) was designed to provide broader protection for consumers than the common law action of fraud. (*Harkala v. Wildwood Realty, Inc.* (1990), 200 Ill. App. 3d 447, 453, 558 N.E.2d 195, 199.) As such, a plaintiff suing under the Act is not required to prove every element of common law fraud in order to recover. (*Mun-*

*jal,* 138 Ill. App. 3d at 182, 485 N.E.2d at 864.) For example, under the Act, a plaintiff need not "show actual reliance nor diligence in ascertaining the accuracy of the misstatements." (*Munjal,* 138 Ill. App. 3d at 182, 485 N.E.2d at 864.) Additionally, the good or bad faith of the seller is irrelevant (*Munjal,* 138 Ill. App. 3d at 182-83, 485 N.E.2d at 864; *Duhl v. Nash Realty Inc.* (1981), 102 Ill. App. 3d 483, 495, 429 N.E.2d 1267, 1277), and a plaintiff can recover for intentional, negligent or even innocently made misrepresentations or omissions. *Carl Sandburg Village Condominium Association No. 1 v. First Condominium Development Co.* (1990), 197 Ill. App. 3d 948, 953, 557 N.E.2d 246, 250.

However, the Act "is not intended to be used as a vehicle for transforming nondeceptive and nonfraudulent statements or omissions into actionable ones." (*Kellerman v. Mar-Rue Realty & Builders, Inc.* (1985), 132 Ill. App. 3d 300, 306, 476 N.E.2d 1259, 1263.) Consequently, not all innocent misrepresentations or omissions are actionable, but only those for which the law considers the seller to be culpable. (*Gordon v. Dolin* (1982), 105 Ill. App. 3d 319, 329, 434 N.E.2d 341, 349.) In other words, although the misrepresentation is made *innocently* in that the seller has no intent to deceive (*Hoke v. Beck* (1992), 224 Ill. App. 3d 674, 679, 587 N.E.2d 4, 8; *Carl Sandburg Village,* 197 Ill. App. 3d at 953, 557 N.E.2d at 250), the seller is still culpable under the Act because he has knowledge of the misrepresentation or omission or such knowledge can be attributed to him (see *Hoke,* 224 Ill. App. 3d at 679, 587 N.E.2d at 8) and the misrepresentation or omission is deceptive or unfair. (*People ex rel. Hartigan v. Stianos* (1985), 131 Ill. App. 3d 575, 581, 475 N.E.2d 1024, 1028.) The reason a seller will be liable under the Act for his misrepresentations or omissions even though he does not have an intent to deceive is because "the center of focus in such matters is not on the intent of the seller but, rather, on the effect that the unlawful conduct might have on the consumer." *Stianos,* 131 Ill. App. 3d at 579, 475 N.E.2d at 1027.

In this case, defendants had a right to rely on the subcontractors to construct the buildings in conformance with the architectural plans. The plaintiffs were unable to show that defendants knew that the collar joints were not filled solid with mortar and, therefore, that the buildings were defective. Additionally, as stated above in the discussion of common law fraud, the fact of water leakage and cracks in several buildings is insufficient to attribute to defendants the knowledge that the buildings themselves were structurally unsound. The structural engineer hired by defendants did not conclude that the building was defective until two months after the litigation began

and plaintiffs' expert and his staff spent approximately 1,900 hours testing the condition of the building before he could conclude to a reasonable degree of engineering certainty the cause of the problem.

The failure to fill the collar joints solid with mortar is clearly a latent or hidden defect which could not be discovered through a normal inspection and defendants did not have a duty to undertake a complicated, lengthy and costly investigation for hidden or latent defects prior to selling the units. (See *Harkala*, 200 Ill. App. 3d at 454, 558 N.E.2d at 200.) Thus, I do not believe that defendants' lack of knowledge of the defective nature of the building can be attributed to culpable, reckless or determined ignorance. (*Hoke*, 224 Ill. App. 3d at 679, 587 N.E.2d at 8; *Crowder v. Bob Oberling Enterprises, Inc.* (1986), 148 Ill. App. 3d 313, 316-17, 499 N.E.2d 115, 117-18.) The Act is intended to protect consumers from fraud and unfair or deceptive practices (Ill. Rev. Stat. 1991, ch. 121$^{1/2}$, par. 261 *et seq.* (now 815 ILCS 505/1 *et seq.* (West 1992))) and not to allow recovery for non-fraudulent and nondeceptive statements or omissions. (*Kellerman*, 132 Ill. App. 3d at 306, 476 N.E.2d at 1263.) When a seller has made an untrue statement without knowledge of its falsity and without reckless or culpable ignorance, he has not committed common law or statutory fraud. He may ultimately be liable for breach of warranty or breach of contract, as is the case here, but he has not committed fraud.

### III. "CLEAR AND CONVINCING" EVIDENCE INSTRUCTION

I recognize that, as a general rule, it is the duty of each party to tender to the court any desired jury instructions and that the decision whether to give the tendered instructions to the jury is within the trial court's discretion. However, under the facts of this case, I believe defendants were prejudiced by the trial court's refusal to give a jury instruction on the "clear and convincing" evidence standard.

There is a "real distinction" between the differing burdens of persuasion in different kinds of cases and, therefore, "it is essential that jurors receive a definition or description of the applicable burden of proof" (*Rikard v. Dover Elevator Co.* (1984), 126 Ill. App. 3d 438, 441, 467 N.E.2d 386, 388) so long as the instruction would not mislead the jury. (*In re Estate of Casey* (1987), 155 Ill. App. 3d 116, 122, 507 N.E.2d 962, 966.) Otherwise, jurors may apply the wrong standard and improperly weigh the evidence to the "extreme prejudice of a litigant." (*Rikard*, 126 Ill. App. 3d at 441, 467 N.E.2d at 388.) "Without basic instructions, each juror would be free to make his or her own interpretation of the law. Instructions provide jurors with a uniformity of approach in the application of the facts to the law." *Rikard*, 126 Ill. App. 3d at 440, 467 N.E.2d at 387.

However, it has been suggested that the term "clear and convincing evidence" be left undefined because its definition is likely to mislead and confuse the jury. (*Casey*, 155 Ill. App. 3d at 122, 507 N.E.2d at 966.) There is no Illinois Pattern Jury Instruction which defines the "clear and convincing" standard and Illinois courts appear to have utilized as many definitions as there are attorneys to propose them. In *P.A. Bergner & Co. v. Lloyds Jewelers, Inc.* (1984), 130 Ill. App. 3d 987, 994, 474 N.E.2d 1256, 1261-62, *rev'd on other grounds* (1986), 112 Ill. 2d 196, 492 N.E.2d 1288, the appellate court catalogued a number of them and stated:

"[C]lear and convincing evidence has been variously defined as evidence which 'leave[s] the mind well satisfied [of the truth of a proposition]' (*Hotze v. Schlanser* (1951), 410 Ill. 265, 269); evidence which 'strikes all minds alike as being unquestionable' (*Lines v. Willey* (1912), 253 Ill. 440, 449); evidence which 'lead[s] to but one conclusion' (*Johnson v. Johnson* (1953), 1 Ill. 2d 319, 324); 'more than a preponderance while not quite approaching the degree of proof necessary to convict a person of a criminal offense' (*In re Estate of Ragen* (1979), 79 Ill. App. 3d 8, 14). There are also a number of cases which define clear and convincing evidence as proof which leaves no reasonable doubt in the mind of the trier of fact."

However, although there is a plethora of "definitions" of the clear and convincing standard, it is universally accepted that the standard is properly described as more than a "preponderance" of the evidence, but less than the standard of "beyond a reasonable doubt." *Casey*, 155 Ill. App. 3d at 122, 507 N.E.2d at 966; *P.A. Bergner & Co.*, 130 Ill. App. 3d at 994, 474 N.E.2d at 1262.

In this case, defendant tendered the following two non-IPI jury instructions:

Defendant's Instruction No. 1:

"Clear and convincing evidence means evidence which should leave no reasonable doubt in your mind concerning the truth of the matters at issue."

Defendant's Instruction No. 2:

"Clear and convincing evidence means evidence that produces in your mind an abiding conviction that the truth of the factual contentions are [*sic*] highly probable."

The trial judge concluded that the term "clear and convincing evidence" was best left undefined and refused to give any definitional instruction.

Two cases which perfectly illustrate the problem with defining "clear and convincing" evidence are *Casey* (155 Ill. App. 3d 116, 507 N.E.2d 962) and *P.A. Bergner & Co.* (130 Ill. App. 3d 987, 474 N.E.2d

1256). In *Casey*, the appellate court held that the trial judge erred in instructing the jury that "clear and convincing evidence" was the degree of proof "which leaves no reasonable doubt in the mind [of] the trier of fact." (*Casey*, 155 Ill. App. 3d at 122.) The *Casey* court reasoned that this definition was "misleading" and that "jurors applying this instruction are likely to be misled and erroneously apply the burden of proof applicable to a criminal case." (155 Ill. App. 3d at 122.) On the other hand, the appellate court in *Bergner* held that the trial court did not err in defining clear and convincing evidence to the jury using reasonable doubt language. The *Bergner* court reasoned that this was a correct definition and whether to give such an instruction is within the trial judge's discretion.

Although whether to give an instruction is within the discretion of the trial court, I believe that in this case the trial judge erred by failing to explain "clear and convincing evidence" to the jury. In *Casey* and the other cases brought to our attention on this issue, every claim presented to the finder of fact was to be decided under the "clear and convincing" standard. In this case, however, the jury was confronted with separate counts which needed to be decided under different burdens. Specifically, plaintiffs had the burden of proving their breach of warranty claims by a "preponderance of the evidence" while the fraud claims needed to be proven by the higher "clear and convincing" standard. The judge never instructed the jury, however, that clear and convincing evidence is a higher standard than the preponderance of the evidence. There is a "real distinction" between these burdens of persuasion, and the judge's failure to explain this difference could seriously prejudice a litigant. I recognize that defendants did not tender such an instruction to the trial judge. However, in light of the fact that the jury was required to apply the "clear and convincing" standard to the fraud claim and, at the same time, decide several other counts under a lesser burden, I believe the trial judge had a duty to explain the difference in the burdens. Such an explanation was necessary in this case to ensure that the jury properly applied the facts to the law. *Rikard*, 126 Ill. App. 3d at 440, 467 N.E.2d at 387.

I must express my dismay at the fact that we can allow juries to decide issues which the law requires be proven by clear and convincing evidence without explaining this standard to them. Jurors are not "schooled" in the subtle differences in the legal burdens of persuasion which apply in different situations. Therefore, even accepting that "clear and convincing" is best left *undefined*, I cannot agree that it should be left *undescribed*. Although Illinois courts have not yet settled on a uniform *definition* of "clear and convincing evi-

dence," all courts agree that the standard is properly *described* as more than a "preponderance of the evidence" but less than the standard of "beyond a reasonable doubt." In cases such as this where the plaintiffs' burden of persuasion on their separate claims is different, an instruction which at least explains the distinction between these burdens must be given in order to assure that a jury does not apply its own interpretation of law to the extreme prejudice of a litigant. Additionally, I express my belief that such an instruction should be given in all cases where the standard to be applied to the facts is the "clear and convincing" standard irrespective of whether the jury is also deciding other issues under different burdens.

## IV. DISMISSAL OF DEFENDANTS' THIRD-PARTY ACTION

Finally, I must dissent from the majority's finding that the trial court properly dismissed defendants' third-party complaint against the third-party defendants, Rabin LeNoble & Associates, Zorak Rabin, Daniel LeNoble, Hans Rosenow Roofing Co., and A. Christmann & Co., Inc. (the Trades). The majority's finding that defendants' third-party action was barred by the two-year construction statute of limitations is contrary to the recently enacted amendment to section 13—204 of the Code of Civil Procedure, existing case precedent and common sense.

Plaintiffs filed their original complaint against defendants and the Trades on June 30, 1983. Defendants filed a counterclaim against the Trades on June 28, 1985. Subsequently, the Trades were dismissed as direct defendants pursuant to the *Moorman* economic loss doctrine. (See *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, 435 N.E.2d 443 (recovery for solely economic loss lies in contract and not tort).) Defendants then recaptioned their counterclaim as a third-party complaint. In July 1990, the Trades filed motions for summary judgment on the grounds that defendants' third-party complaint was time barred by the construction statute of limitations in section 13—214(a) of the Code of Civil Procedure. On September 5, 1990, Judge Berman denied the summary judgment motions, finding that the statute of limitations for a third-party complaint seeking contribution or indemnity did not commence until the filing of the underlying action. Subsequently, on May 17, 1991, however, Judge Wolfson entered an order dismissing defendants' third-party action pursuant to section 2—619 of the Code of Civil Procedure. (Ill. Rev. Stat. 1991, ch. 110, par. 2—619 (now 735 ILCS 5/2—619 (West 1992)).) Judge Wolfson found that Judge Berman had erred and that section 13—214(a) applied to bar defendants' third-party action for implied contractual indemnity and contribution.

Section 13—214(a) provides in pertinent part:

"(a) Actions based upon tort, contract or otherwise against any person for an act or omission of such person in the design, planning, supervision, observation or management of construction, or construction of an improvement to real property shall be commenced within 2 years from the time the person bringing an action, or his or her privity, knew or should reasonably have known of such act or omission." Ill. Rev. Stat. 1983, ch. 110, par. 13—214(a).

This issue is moot, however, in light of the recently enacted amendment to section 13—204 of the Code of Civil Procedure. (Ill. Rev. Stat. 1991, ch. 110, par. 13—204 (now 735 ILCS 5/13—204 (West 1992)).) The relevant portions of the amendment provide in pertinent part:

"§ 13—204. Contribution and Indemnity.

\*\*\*

(b) In instances where an underlying action has been filed by a claimant, no action for contribution or indemnity may be commenced more than 2 years after the party seeking contribution or indemnity has been served with process in the underlying action or more than 2 years from the time the party, or his or her privy, knew or should reasonably have known of an act or omission giving rise to the action for contribution or indemnity, *whichever period expires later.*

(c) The applicable limitations period contained in subsection (a) or (b) shall apply to all actions for contribution or indemnity and shall preempt, as to contribution and indemnity actions only, all other statutes of limitation or repose, [including those applicable to the underlying action].

(d) The provisions of this amendatory Act of 1993 shall be applied retroactively when substantively applicable, including all pending actions without regard to when the cause of action accrued; provided, however, that this amendatory Act of 1994 shall not operate to affect statutory limitations or repose rights of any party which have fully vested prior to its effective date." (Emphasis added.) Pub. Act 88—538, eff. January 1, 1995 (amending 735 ILCS 5/13—204 (West 1992)).

Pursuant to the provisions of this amendment, defendants' third-party action was timely filed and not barred by the construction statute of limitations. This amendment to section 13—204 provides that an action for contribution or indemnity must be filed within two years after the party seeking contribution or indemnity has been served with process in the underlying action or within two years from the time the party knew or reasonably should have known of

the act or omission giving rise to the action for contribution or indemnity *whichever period expires later.* Assuming that defendants knew of the acts or omissions giving rise to their contribution and indemnity actions as early as 1979 as plaintiffs assert, defendants still filed their third-party complaint within two years of being served with process in the underlying action. Thus, their action was timely filed under the amendment. Since the amendment is to be applied retroactively, defendants' third-party complaint should be reinstated.

Notwithstanding this amendment to section 13—204, the dismissal of defendants' third-party complaint seeking contribution and implied contractual indemnity also was improper under the pre-amendment case law.

Prior to the amendment, it had been established law in Illinois that a statute of limitations applicable to a plaintiff's underlying direct action applied to any third-party actions, regardless of the theory upon which the third-party action was based. (*Antunes v. Sookhakitch* (1992), 146 Ill. 2d 477, 491, 588 N.E.2d 1111, 1117-18; *Hayes v. Mercy Hospital & Medical Center* (1990), 136 Ill. 2d 450, 458-61, 557 N.E.2d 873, 877-78; *Caballero v. Rockford Punch Press & Manufacturing Co.* (1993), 244 Ill. App. 3d 333, 337, 614 N.E.2d 362, 365; *Rummel v. Yazoo Manufacturing Co.* (1991), 222 Ill. App. 3d 526, 530, 583 N.E.2d 19, 21-22; *Highland v. Bracken* (1990), 202 Ill. App. 3d 625, 630, 560 N.E.2d 406, 410; *La Salle National Bank v. Edward M. Cohon & Associates, Ltd.* (1988), 177 Ill. App. 3d 464, 469, 532 N.E.2d 314, 319; *Hartford Fire Insurance Co. v. Architectural Management, Inc.* (1987), 158 Ill. App. 3d 515, 519-20, 511 N.E.2d 706, 709-10.) Additionally, courts agree that the right to a contribution action exists in inchoate form at the time of the injury and that it does not accrue until (a) the party seeking contribution makes payment or obligates himself to make payment; or (b) the party seeking contribution "is sued in an underlying direct action and given notice of the nature of the action upon which the contribution claim is based." (*Caballero*, 244 Ill. App. 3d at 338, 614 N.E.2d at 365-66.) Therefore, numerous courts have held that the statute of limitations period for purposes of a third-party claim begins to run either on the date of the filing of the underlying complaint against defendant or on the date of service of process. (See *Hayes*, 136 Ill. 2d at 458-61, 557 N.E.2d at 877-78; *Caballero*, 244 Ill. App. 3d at 337, 614 N.E.2d at 365; *Rummel*, 222 Ill. App. 3d at 530, 583 N.E.2d at 21-22; *Highland*, 202 Ill. App. 3d at 630, 560 N.E.2d at 410; *La Salle National Bank*, 177 Ill. App. 3d at 469, 532 N.E.2d at 319; *Hartford*, 158 Ill. App. 3d at 519-20, 511 N.E.2d at 709-10.) In *Henderson v. Jones Brothers Construction Corp.* (1992), 234 Ill. App. 3d 871, 874, 602 N.E.2d 16, 19, this court

affirmed the dismissal of a defendant's third-party claim for contribution on the ground that the defendant failed to file within the applicable construction statute of limitations period contained in section 13—214 of the Code of Civil Procedure. (Ill. Rev. Stat. 1991, ch. 110, par. 13—214 (now 735 ILCS 5/13—214 (West 1992)).) We concluded, however, that the limitations period in section 13—214 was "triggered" when defendant received a copy of the summons and complaint. *Henderson*, 234 Ill. App. 3d at 874, 602 N.E.2d at 19.

Two of the cases we relied heavily upon in coming to our conclusion in *Henderson* were *Hartford Fire Insurance Co. v. Architectural Management, Inc.* (1987), 158 Ill. App. 3d 515, 511 N.E.2d 706, and *La Salle National Bank v. Edward M. Cohon & Associates, Ltd.* (1988), 177 Ill. App. 3d 464, 532 N.E.2d 314. In *Hartford*, defendants were sued for their alleged negligence in the design and construction of a school. They brought a third-party action for contribution nearly four years after the original action was filed against them. The *Hartford* court held that section 13—214 was "intended to encompass all actions against persons involved in the construction-related activities" (*Hartford*, 158 Ill. App. 3d at 518) and that the section's two-year "discovery" period applied to bar defendant's contribution claim. The *Hartford* court reasoned that "the latest date" on which defendant could be charged with discovery of the acts or omissions alleged in its counterclaim for contribution was the date on which the original action was filed by plaintiffs. 158 Ill. App. 3d at 520.

In *La Salle*, defendant was sued for the alleged negligent design and construction of an underground storm water detention basin. The *La Salle* court agreed with the *Hartford* court that "the 'trigger' date for knowledge by a defendant of a potential claim for third-party relief is the date of filing of the underlying complaint." (*La Salle*, 177 Ill. App. 3d at 471.) The *La Salle* court stated, however, that "it would [not] be inconsistent with the holding or rationale in *Hartford* for a court to consider, in an appropriate case, the date of service of the complaint upon a defendant rather than the date of filing of the complaint, particularly where the service date came much later than the date of filing." 177 Ill. App. 3d at 471. See also *Caballero*, 244 Ill. App. 3d at 339, 614 N.E.2d at 366 (contribution claim untimely when applicable limitations period was two years and claim was filed more than five years after defendant was sued and given notice of the nature of the action upon which his contribution claim was based); *Rummel*, 222 Ill. App. 3d at 529-31, 583 N.E.2d at 20-21 (action for contribution accrued and statute of limitations began to run when plaintiff filed original complaint against defendant);

*Highland*, 202 Ill. App. 3d at 630, 560 N.E.2d at 409-10 (contribution action accrued for purposes of statute of limitations on date action was filed against defendant); *Bonfield v. Jordan* (1990), 202 Ill. App. 3d 638, 642, 560 N.E.2d 412, 415 (contribution action accrued on date suit was filed against defendant).

Additionally, in *Anixter Brothers, Inc. v. Central Steel & Wire Co.* (1984), 123 Ill. App. 3d 947, 953, 463 N.E.2d 913, 918, the appellate court reasoned that a claim for implied contractual indemnity cannot be determined until the underlying liability and damages are determined. Therefore, the *Anixter* court held that the statute of limitations on an action for implied contractual indemnity does not begin to run "until the defendant has a judgment entered against him or until he settles the claim made against him." 123 Ill. App. 3d at 953.

The majority relies upon *Board of Library Directors v. Skidmore, Owings & Merrill* (1991), 215 Ill. App. 3d 69, 574 N.E.2d 869. However, the reasoning and ultimate holding of the *Library Directors* court was incorrect and, therefore, I believe the majority's reliance upon it is misplaced. In *Library Directors*, plaintiff filed its complaint against Wil-Freds on December 12, 1984. On July 22, 1988, Wil-Freds brought its third-party complaint for indemnification against another defendant. The third-party defendant brought a motion to dismiss Wil-Freds' indemnification claim for, *inter alia*, failure to bring the action within the applicable statute of limitations. The trial judge determined that Wil-Freds "discovered" the construction problems no later than 1979 and, therefore, the third-party claim was barred by the four-year construction statute of limitations.[3]

The appellate court first considered whether the statute of limitations in section 13—214 applied to Wil-Freds' third-party claim for indemnity and, citing to *La Salle* and *Hartford*, properly concluded that it did. In coming to this conclusion that the construction limitations period applied, the *Library Directors* court quoted the language from *La Salle* and *Hartford* where these courts held that the statute of limitations began to run either when the complaint was filed (*Hartford*, 158 Ill. App. 3d 515, 511 N.E.2d 706) or when the complaint was served on defendant (*La Salle National Bank*, 177 Ill. App. 3d 464, 532 N.E.2d 314). Curiously, however, the court did not apply this reasoning and hold that the third-party complaint was timely filed within four years of the original filing. Inexplicably, the court instead then found controlling the case of *Freeport Memorial*

---

[3]The two-year limitations period in section 13—214 was amended in 1985 to four years. Ill. Rev. Stat. 1985, ch. 110, par. 13—214.

*Hospital v. Lankton, Ziegele, Terry & Associates, Inc.* (1988), 170 Ill. App. 3d 531, 525 N.E.2d 194.

In *Freeport*, plaintiff brought an action against defendants for the alleged negligent design and construction of an addition to plaintiff's hospital. The hospital addition was completed in 1976. Plaintiff filed its action in 1984. Plaintiff alleged in its complaint that it "did not know or have any reason to know of these defects caused by the negligence of defendants until the defects were discovered on September 18, 1983, during an inspection." (170 Ill. App. 3d at 533.) The defendants filed motions to dismiss on the grounds that plaintiff's action was barred by the construction statute of limitations in section 13—214. In support of their motions, defendants attached the affidavit of one of plaintiff's former administrators to the effect that he knew of the problems in 1978. Additionally, one of the architects testified by affidavit that plaintiff had complained of the problems and investigated them in early 1981. Plaintiffs did not dispute the facts set forth in defendants' supporting affidavits and did not offer any countering affidavits. Accordingly, the *Freeport* court affirmed the dismissal of plaintiff's complaint because it failed to allege facts showing that the cause of action was not and could not have been discovered earlier.

In *Library Directors*, the third-party defendant offered an affidavit of one of the architects and the deposition testimony of the plaintiff's expert to the effect that the problems were apparent and Wil-Freds was aware of them as early as 1978. Wil-Freds' response to the motion to dismiss did not include any counterevidentiary material. Following the reasoning of *Freeport*, the *Library Directors* court held that "[w]ith no evidence to the contrary in its responses to the motion to dismiss, the only conclusion available is that Wil-Freds knew or should have known of an actionable defect in 1978." *Library Directors*, 215 Ill. App. 3d at 76.

The majority's reliance upon *Library Directors* is misplaced because the *Library Directors* court, in coming to its conclusion, incorrectly followed the *Freeport* case. The *Freeport* decision was wholly inapplicable to the facts in *Library Directors* and the court's reliance upon it resulted in an incorrect decision. Unlike in *Library Directors*, the *Freeport* case involved a direct action and not a third-party complaint. Therefore, whether Wil-Freds knew or should have known of the defect as early as 1978 was irrelevant because in a case involving a third-party complaint the statute of limitations period would begin to run either when the original complaint was filed (*Hartford*, 158 Ill. App. 3d 515, 511 N.E.2d 706) or when the complaint was served on defendant. (*La Salle National Bank*, 177 Ill.

App. 3d 464, 532 N.E.2d 314.) In effect, the *Library Directors* court precluded the defendant from having the merits of his claim heard because he failed to file his third-party action two years *before* he was even sued. The purpose of a statute of limitations is to prevent stale claims (*Freeport*, 170 Ill. App. 3d at 537, 525 N.E.2d at 198), not to preclude claims before they are even ripe for adjudication.

In the instant case, defendants were sued on June 30, 1983. They brought their third-party claim on June 28, 1985. The Trades argue that defendants knew of the problems as early as 1979. According to the Trades' argument, therefore, defendants are barred because they were required to file their third-party claims by 1981, two years before they were even sued. Such a result is irrational, "unfair to the defendant and would place an unreasonable and unjustifiable burden on the court system." (*Highland*, 202 Ill. App. 3d at 633, 560 N.E.2d at 411.) By deciding this issue as it does, the majority is establishing a rule which requires a defendant to file any third-party claims prior to his even being sued. Such a rule will undoubtedly promote unnecessary litigation and create a "cottage industry" specializing in prophylactic lawsuits, perhaps declaratory in nature, on behalf of every potential defendant seeking to protect and preserve his third-party rights to a claim which has not yet and may not ever be asserted. Judges will be required to anticipate possible theories of liability and render decisions on potential third-party claims before the underlying facts or theories of liability have even been set forth. Determining the amount of damages in a third-party claim before a jury has even settled on defendant's liability in an underlying action would most often be an unnecessary exercise in futility. And would any third-party damages obtained be required to be placed in escrow until the underlying action is concluded or, better yet, until the potential plaintiff himself fails to file within his statute of limitations? Consequently, for the reasons stated, I also must dissent from the majority's finding that defendants' third-party complaint against the Trades was properly dismissed.

## SUPPLEMENTAL DISSENT ON REHEARING

JUSTICE BUCKLEY, dissenting:

The majority of this court issued an opinion in this matter on June 30, 1994. Among the holdings in that opinion, this court affirmed the findings of common law and statutory fraud against defendants, affirmed the trial court's refusal to instruct the jury on the "clear and convincing evidence" standard of proof to be used in deciding liability under the fraud claims, and found that the

defendants' third-party action against the Trades was barred by the statute of limitations. I dissented from these findings, and I must now dissent from the majority order denying defendants' petition for rehearing.

The defendants' first argument set forth in their petition for rehearing is based on the amendment to section 13—204 of the Illinois Code of Civil Procedure. Section 13—204 was amended on March 31, 1994, and provides that an action for contribution or indemnity may be commenced within two years after the party seeking contribution or indemnity has been served with process in the underlying action or within two years from the time the party, or his or her privy, knew or should reasonably have known of an act or omission giving rise to the action for contribution or indemnity, *whichever period expires later.* Section 13—204(d) states that this amendment should be applied retroactively when substantively applicable. Pursuant to this amendment, defendants' third-party action was timely filed. Defendants filed their contribution action within two years after they were served with process by the plaintiffs. In denying the defendants' petition for rehearing, the majority has failed to consider the amendment to section 13—204 of the Code of Civil Procedure.

Notwithstanding the amendment to section 13—204, case precedent and common sense dictate that the statute of limitations period for purposes of a third-party claim begins to run either on the date of filing of the underlying complaint against defendant or on the date of service of process. (See *Hayes v. Mercy Hospital & Medical Center* (1990), 136 Ill. 2d 450, 458-61, 557 N.E.2d 873, 877-78; *Caballero v. Rockford Punch Press & Manufacturing Co.* (1993), 244 Ill. App. 3d 333, 337, 614 N.E.2d 362, 366; *Rummel v. Yazoo Manufacturing Co.* (1991), 222 Ill. App. 3d 526, 530, 583 N.E.2d 19, 21-22; *Highland v. Bracken* (1990), 202 Ill. App. 3d 625, 630, 560 N.E.2d 406, 410; *La Salle National Bank v. Edward M. Cohon & Associates, Ltd.* (1988), 177 Ill. App. 3d 464, 469, 532 N.E.2d 314, 319; *Hartford Fire Insurance Co. v. Architectural Management, Inc.* (1987), 158 Ill. App. 3d 515, 519-20, 511 N.E.2d 706, 709-10.) According to the majority, defendants were required to file their third-party claims against the Trades two years before the plaintiffs filed their claims against the defendants. Such a position is beyond comprehension and would lead to the bizarre results articulated in my initial dissent. Certainly the law in this State does not require a defendant to file a claim before it is ripe. Indeed, such a premature claim would be dismissed. Therefore, I believe this court should reconsider its finding on this issue.

In addition, I feel it is necessary to reemphasize my strong dissension from the majority's finding that the plaintiffs proved fraud by clear and convincing evidence. No evidence in the record supports the plaintiffs' burden of showing that the defendants had knowledge of the structural defects in building four at the time they were selling the building four units. When plaintiffs' counsel asked defendant, Ray Adreani, whether he learned that a collar joint in building four was not filled solid with mortar he responded, "That's what you told me." He subsequently stated that "maybe" that was true in a couple of spots. However, this was not an admission that he knew there were structural defects. Defendant was merely accepting plaintiffs' counsel's contention as possible. Defendants' reliance on the architectural plans was justified. They could not be expected to know of the structural defects based on the water leakage problems and cracks in the outer walls of several buildings. The defendants believed that the measures they were taking would solve the water leakage problems and the plaintiffs have failed to show that defendants knew or believed otherwise.

The cases cited by the majority to support its finding that fraud was proved in this case involve sellers who were actively concealing defects, such as water damage and the illegality of apartment units. (See *Fleisher v. Lettvin* (1990), 199 Ill. App. 3d 504, 557 N.E.2d 383; *Munjal v. Baird & Warner, Inc.* (1985), 138 Ill. App. 3d 172, 485 N.E.2d 855; *Tan v. Wagner* (1987), 156 Ill. App. 3d 49, 508 N.E.2d 390; *Kinsey v. Scott* (1984), 124 Ill. App. 3d 329, 463 N.E.2d 1359.) None of the cases cited by the majority involve a developer selling newly constructed residential property. A distinction should be made between a seller who occupied or owned the sale property and possessed personal knowledge of the *cause* of water leakage and a seller who never occupied the sale property and possessed knowledge only of the water leakage but not the cause of such leakage. The plaintiffs have not shown that the defendants' statements or omissions were untrue or that they were actively concealing water damage from the buyers of building four units.

The recently enacted Residential Real Property Disclosure Act further fortifies my position that the facts relied upon by plaintiffs do not give rise to fraud. The Act requires a seller of residential real property with at least one but not more than four dwelling units to disclose to potential buyers the existence of certain conditions and material defects existing in the sale property. (Pub. Act 88—111, eff. October 1, 1994.) Section 15(9) of the Act specifically excludes the transfers of newly constructed residential real property that has not been occupied. Under the Act, sellers such as the defendants do not

have a duty to disclose the existence of defects such as water leakage. This court should take note of the legislature's view that sellers who have owned or occupied property have a greater duty of disclosure to buyers than sellers of newly constructed property.

The finding of fraud was against the manifest weight of the evidence and defendants were entitled to a judgment notwithstanding the verdict on the common law fraud claim. In addition, the defendants' lack of knowledge of the structural defects cannot be attributed to culpable, reckless or determined ignorance and, therefore, the trial court erred in finding a violation of the Consumer Fraud Act.

Finally, I believe that the trial court's failure to instruct the jury on the "clear and convincing" standard of proof caused an egregious miscarriage of justice. The jury in this case was faced with the determination of several claims, some of which involved the "preponderance of the evidence" standard of proof. The fraud claims involved the higher "clear and convincing" standard, but the jury was never instructed on the distinction between the two. Juries are not expected to understand the subtle differences between these two standards. Allowing a jury to make these determinations without describing the evidentiary standards to be applied renders the difference between the standards a nullity. The trial court erred in failing to instruct the jury on the "clear and convincing" standard and defendants were prejudiced by this failure. In my opinion, this error alone constituted a sufficient reason to overturn the judgment of fraud against the defendants. For all of these reasons, I must dissent from the majority's decision to deny defendants' petition for rehearing.